FREDERICKA HOMBERG WICKER, Judge.
|2The defendant/appellant, R.V., appeals his conviction and sentence for vehicular homicide in violation of La. R.S. 14:32.1. He argues that the State did not prove beyond a reasonable doubt that his intoxication caused the accident that led to the victim’s death. After a thorough review of the record, we find that R.V. was impaired when the accident occurred and that such impairment was a contributing factor that led to the victim’s death. Therefore, the conviction and sentence are affirmed.
*404 Factual and Procedural Background
On Friday, April 30, 2010, J.P. spent the night at the home of his best friend — 14-year-old C.O. The young boys woke up between 11:30 A.M. and 12:00 P.M. the following day, Saturday, May 1, 2010, and rode their bikes to J.P.’s house.
Meanwhile, 16-year-old R.V. picked up his friend L.P. between 12:30 and 1:00 P.M. in his mother’s 2007 black Jeep Cherokee. M.F., another one of their friends, was already seated in the front passenger seat when L.P. got inside the Jeep. The boys then drove to KO.’s house to pick him up. Both K.O. and L.P. sat in the rear. The boys rode around in the Jeep for the remainder of the day. R.V., L.P., and M.F. began smoking marijuana from L.P.’s bong around 1 P.M. The | ¡¡three boys shared two bowls of marijuana, each taking approximately three to four hits from each bowl. The last time the boys smoked was between 4 and 5 P.M. At approximately 6:30 P.M., a member of the Jefferson Parish Sheriffs Office pulled the boys over because the Jeep was swerving. The officer removed the boys from the Jeep, separated and searched them, and then searched the Jeep. Although the officer located the bong and a marijuana grinder, the boys were allowed to leave. R.V. dropped L.P. off at home around 7:30 P.M.
Later that evening, C.O. decided to spend the night at J.P.’s house but remembered he left his' charger at home. The boys cycled back to C.O.’s house to get the charger and then headed back to J.P.’s house. On the return trip, the boys came upon R.V. around 10:30 P.M. C.O. and J.P. were afraid they would not make their 11 o’clock curfews riding their bikes. So R.V., a close friend of C.O.’s older brother, offered to give them a ride home. C.O. and J.P. left their bikes at a friend’s house and got into the Jeep — KO. was now in the front passenger seat. C.O. sat behind K.O. in the rear, and J.P. sat behind R.V. C.O. and J.P. were unaware that R.V. had smoked marijuana earlier in the day. R.V. and K.O. shared a Mad Dog 20/20 while the two boys were passengers in the back seat. Although R.V. had been drinking and smoking marijuana, he seemed to be driving normally. However, things took a drastic change for the worst when the boys arrived on West Metairie Road.
While R.V. was in the left lane on West Metairie Road, a Mustang pulled up next to him in the right lane and revved its engine. The Mustang sped off and R.V. accepted its invitation. R.V. immediately took off in the left lane next to the Mustang. R.V. was traveling between 50 and 60 mph. The two vehicles were swiftly driving next to each other when R.V. swerved the Jeep into the middle of the right lane where the Mustang was driving. The Mustang, while still in the right plane, passed R.V. and then cut in front of him in the left lane. R.V. swerved to the left, and his wheel hit the curb. He attempted to overcorrect but lost control of the Jeep. The Jeep flipped several times and landed in the canal. The accident occurred at approximately 11:11 P.M. R.V. was ejected from the Jeep, and J.P. landed in the canal. K.O. left the scene on foot, telling J.P. that he had “to get out of there.” J.P. looked for his best friend, C.O. He was nowhere to be found.
Someone reported the accident to 9-1-1, but the caller was unable to identify the exact location. Deputy Robert Mitchell, of the Jefferson Parish Sheriffs Office, was in the area and was one of the first responders on the scene. He observed the Jeep in the canal in the 6700 block of West Metairie Road and radioed the other officers to give them the location. Dep. Mitchell saw R.V. sitting on the median holding his head. He asked R.V. whether *405 there were any other passengers. Though erratic, R.V. gave the deputy J.P.’s name. Dep. Mitchell then approached J.P. and asked him the same thing. J.P. told the deputy that K.O. had walked away. At that time, another officer yelled, “there’s one in the water.” Dep. Mitchell ran over to the canal, removed his safety belt, and went into the water with Dep. Keith Young to retrieve C.O. C.O. was face down in the two-foot deep water. When the deputies retrieved C.O. from the water, his body was pale, cold, and lifeless. C.O. was transported to East Jefferson General Hospital where he was pronounced dead at 2:12 A.M. on Sunday, May 2, 2010.
R.V. arrived at Ochsner Hospital at 11:51 P.M. on May 1, 2010. The attending physician ordered an ADX — alcohol and drug test. R.V.’s blood alcohol level was 0.045. Marijuana was also detected in his system. After C.O.’s death, the Jefferson Parish Sheriff’s Office went to Ochsner Hospital and arrested R.V.
On August 2, 2010, the Jefferson Parish District Attorney’s office filed a petition charging R.V. with vehicular homicide in violation of La. R.S. 14:32.1(A)(3). |sThe petition alleged that while R.V. was engaged in the operation of a motor vehicle, he killed a minor child while under the influence of a controlled dangerous substance. The State then moved to revoke his probation and bond on August 12, 2010.[1] R.V.’s bond was revoked on August 18, 2010. The court deferred ruling on the motion to revoke probation until after the trial. The State subsequently amended its petition on September 2, 2010, to additionally state that R.V. was under the influence of alcohol. The trial commenced on September 15, 2010.
Ms. Andrea Gardner, the attending emergency room nurse at Ochsner Hospital, testified that R.V. arrived in the emergency room at 11:51 P.M. on May 1, 2010. Ms. Gardner drew R.V.’s blood and urine at 12:18 A.M. on Sunday, May 2, 2010. Prior to the draw, Ms. Gardner testified that she prepped R.V.’s arm with chlora-prep, which is comprised of 70% isopropyl alcohol. She then waited for the area to dry in order to prevent the possibility of cross-contamination. Once the area dried, Ms. Gardner inserted the IV into R.V.’s arm and withdrew the blood which went into several separate vials. She then labeled the vials, placed them in the pneumatic tube, and sent them to the lab along with the urine sample she drew from the catheter.
Ms. Karen Bullock, the core laboratory manager at Ochsner Clinic Foundation, also testified. She testified that specimen obtained in the emergency room primarily comes to the lab through the pneumatic tube system. She testified that the laboratory performed a comprehensive blood screen on R.V.’s blood and a comprehensive drug panel on his urine. Ms. Bullock testified that R.V.’s specimen arrived in the lab at 12:28 A.M. on May 2, 2010. Based on their procedures, an employee removes the specimen from the pneumatic tube when it arrives in the |filab. The urine specimen is then placed in a smaller tube, spun, and then given to the chemistry department which is located in the same room 15 to 20 feet away. The same procedure is repeated for the blood specimen with the exception of spinning.
Mr. Alton Smith, the CSR tech in the laboratory, testified that he is responsible for verifying specimen received in the lab. He testified that he retrieved R.V.’s speci *406 men from the pneumatic tube at 12:28 A.M. on May 2, 2010. After completing his verification, he then delivered the specimen to the chemistry department at 12:41 A.M. Mr. Smith testified that he had no reason to believe the specimen was contaminated.
Mr. William Toups, an employee at Ochsner Core Laboratory, testified that he received the urine specimen from Alton Smith. He performed a urinary toxicology screen — a screen that detects drugs of abuse. At 12:43 A.M., the urine specimen tested positive for benzos and THC, which is commonly referred to as marijuana. Mr. Toups testified that he had no reason to believe the specimen was contaminated.
Ms. Jawanna Savoie worked as a medical technologist for Ochsner on May 2, 2010. She testified that when she received the specimen from William Toups, she verified the paperwork and checked the blood specimen for clots. She then placed the blood on the analyzer. Ms. Savoie testified that the blood ETRH was positive .045 milligrams per deciliter. She completed the blood test at 1:13 A.M. on May 2, 2010. She also testified that she had no reason to believe that the blood specimen was contaminated.
Ms. Marketia Jackson, an emergency room staff nurse at Ochsner Hospital, testified that at 3:25 A.M. on May 2, 2010, she withdrew R.V.’s blood and urine at the direction of the Jefferson Parish Sheriffs Office. She testified that the officers |7came into the room, gave her a kit, and explained to her that she had to use everything in the kit to draw the blood. She placed a tourniquet on R.V.’s left arm and prepped the area with the betadine inside the kit. Once the area dried, she then used a venipuncture needle to draw the blood. She then obtained urine from the Foley catheter that was already in place. Ms. Jackson testified that she labeled the samples with the police and that the police remained in the room the entire time. She also testified that she had no reason to believe the specimen was contaminated.
Deputy Brian Sharp, a crime scene technician for the Jefferson Parish Sheriffs Office, picked up the blood kit from Ochs-ner Hospital at 3:40 A.M. on May 2, 2010. He took the kit to the crime scene office and stored it in the refrigerator used for biological evidence. He testified that nothing transpired while en route from the hospital that would have contaminated the kit. Ms. Helena Major testified that she removed the blood kit from the refrigerator at 9:00 A.M. on May 7, 2010, packed it in an ice pack, and drove the kit from Jefferson Parish to Baton Rouge, Louisiana to the Louisiana State Police Crime Lab (the “state crime lab”). Ms. Major testified that the seal was not broken on the kit so she had no reason to believe the specimen was contaminated. Once she arrived at the state crime lab, Ms. Major gave the kit to Ms. Lynsey Martrain, the evidence custodian. Ms. Martrain testified that she received the kit from Helena Major on May 7, 2010, at 10:30 A.M. and placed it in the transfer cabinet 23 (TC 23) — the locked refrigerator for toxicology. Mr. Derrick Morgan testified that he removed the kit from TC 23 on May 11, 2010, at 1:30 P.M. He then took the kit to the blood alcohol room to inventory it. Thereafter, he retrieved two samples from the blood tube and tested it using a gas chromatograph machine. He testified that there was no ethanol alcohol detected. Mr. Morgan returned the sealed blood alcohol kit to Tox Shelf 11 for toxicology analysis. Ms. Carla Cobert testified that she removed |sthe specimen from Tox Shelf 11 on June 16, 2010. She then placed the kit in a box and shipped it, via UPS next day air, to AIT Labs in Indianapolis, IN. Ms. Cobert testified that the *407 kit was sealed when she received it and when it was returned, so she had no reason to believe the specimen was contaminated.
Dr. Scott Kriger, an expert in toxicology and forensic toxicology, also testified at trial. Dr. Kriger worked for AIT Labs— the laboratory that performed the toxicology analysis on R.V.’s blood. Dr. Kriger first testified regarding the procedures set forth at AIT Labs. He testified that the laboratory ensures all specimen it receives are sealed. If the specimen is not sealed, their laboratory will not test it. If sealed, the kit is opened and all the demographic information related to the specimen donor is inputted into a computer system which generates a unique identification bar code. The bar code then identifies the specimen throughout testing. Dr. Kriger testified that once the bar code is generated, a presumptive testing analysis is performed to determine what classes of drugs may be present in the specimen. If anything tests positive, they then perform a confirmation analysis that unequivocally identifies each specific drug that is present in the specimen. Once all testing is complete, the specimen is sealed and returned to the client. He testified that he reviews all the data before a report is sent to the client.
In this particular case, Dr. Kriger testified that AIT began a whole blood analysis on R.V.’s specimen on July 20, 2010, and completed the analysis on July 22, 2010. Dr. Kriger testified that R.V.’s specimen tested positive for THC (marijuana) and carboxy THC.[2] R.V.’s THC concentration was measured to be 2.5 nanograms per millimeter; while the carboxy THC was measured to be 34.2 nanograms per millimeter. Dr. Kriger opined that THC in the blood reaches its maximum within 20 to 30 minutes after it has been smoked. He testified that Rthough users “consider themselves to be stoned” for up to four to six hours after use, the effects of marijuana use can last up to 24 hours — noting that a user’s behaviors and mannerisms reveal impairment. Dr. Kriger testified that some of the impairing effects associated with marijuana use include slurred speech; delayed thought processes and physical motions; prolonged response time; and inability to recognize distance. Dr. Kriger opined' that R.V. had smoked marijuana within 7.92 hours of the accident, which is well within the 24-hour period within which users reveal signs of impairment. Dr. Kriger further opined that R.V. was impaired at the.time of the accident and that the impairment was a contributing factor in causing the accident.
Dr. William George, an expert in pharmacology and toxicology, also testified. He noted that R.V.’s blood alcohol level was 0.045 but pointed out that the specimen tested was not a whole blood alcohol level but was a serum or plasma level. Dr. George stressed the importance of this difference stating that the serum or plasma level is higher than whole blood by approximately 15 percent. Dr. George applied a mathematical formula which indicated that R.V.’s whole blood alcohol level was actually 57 milligrams percent, which he noted as significant. Dr. George further added that at 50 milligrams percent, reaction time is prolonged by 25 percent. He opined that based on R.V.’s blood alcohol level and age, the chances of this accident increased by 17 percent. He further opined that based upon the combination of the. use of marijuana and alcohol, along with the recency of marijuana use, R.V. was impaired when the accident occurred. *408 He further opined that such impairment was a contributing factor in increasing the risk of the accident in this case.
At the conclusion of the trial, the judge found R.V. guilty of vehicular homicide. The trial judge noted that R.V.’s impairment was a contributing factor |inwhich caused him to engage in the drag race with the Mustang that resulted in C.O.’s death. The judge revoked R.V.’s probation and sentenced him to secure care until his 21st birthday. The sentence was to ran concurrently with the other sentences imposed after his probation was revoked.
Assignment of Error
In his sole assignment of error, R.V. contends that the facts do not establish beyond a reasonable doubt that his marijuana and alcohol consumption caused the accident which led to C.O.’s death.

Standard of Review

Though delinquency proceedings may in many ways implicate criminal proceedings, they are nonetheless civil in nature. State ex rel. D.R., 01-0405, p. 5 (La.App. 4 Cir. 10/13/10), 50 So.3d 927, 930 citing In re C.B., 97-2783, p. 17 (La.3/4/98), 708 So.2d 391, 400. As the Louisiana Supreme Court stated in State ex. rel Batiste, 367 So.2d 784, 788 (La. 1979):
[jjuvenile delinquency proceedings do not fall within the category of criminal prosecutions, as is evident from long established jurisprudence ..., and the special juvenile provisions within the judiciary article of the constitution. La. Const. 19 71, art. 5, ss 10, 18 and 19. Accordingly, since the constitution does not provide otherwise, the scope of review of this court in juvenile delinquency proceedings extends to both the law and the facts, (ellipsis indicates citations omitted; emphasis added). Id.
Because juvenile proceedings are not criminal proceedings, the scope of review in Louisiana extends to both law and facts. Id. This “clearly wrong” or “manifestly erroneous” standard of review is the same as is applied in other civil cases. Id. at 931. In this case, we apply this civil standard of review of facts and law to determine whether there was sufficient evidence of proof beyond a reasonable doubt to adjudicate R.V. a delinquent for vehicular homicide. In determining the sufficiency of the evidence, the court must determine whether the Inevidence, viewed in the light most favorable to the prosecution, is sufficient to convince a rational trier of fact that all of the elements of the crime have been proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
Discussion
In order for the court to adjudicate a child delinquent, the State must prove beyond a reasonable doubt that the child committed the delinquent act alleged in the petition. La. Ch.C. art. 883. In this case, the State bears the burden of proving beyond a reasonable doubt,
[t]he killing of a human being caused proximately or caused directly by an offender engaged in the operation of ... any motor vehicle ... whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exists and such condition was a contributing factor to the killing:
[[Image here]]
(3) The operator is under the influence of any controlled dangerous substance listed in Schedule I, II, III, IV, or V as set forth in R.S. 40:964.
(4) The operator is under the influence of alcoholic beverages. La. R.S. 14:32.1.
*409 In this case, R.V. does not dispute that he smoked marijuana or drank alcohol prior to the accident. Rather, he contends that the State did not prove beyond a reasonable doubt that his marijuana and alcohol consumption was a contributing factor to the accident that caused C.O.’s death.
The purpose of the vehicular homicide statute is to “curb traffic fatalities caused by the consumption of alcohol.” State v. Taylor, 463 So.2d 1274, 1275 (La.1985). The statute, however, is not aimed at persons involved in vehicular fatalities whose alcohol consumption merely coincides with an accident. Id. Rather, the State must show a causal connection between the impaired driving and 112the victim’s death. State v. Bellow, 08-259, p. 11 (La.App. 5 Cir. 7/29/08), 993 So.2d 307, 313 writ denied, 08-2109 (La.4/13/09), 5 So.3d 162. (citation omitted). Causation is a question of fact that must be considered in light of the totality of the circumstances surrounding the ultimate harm and its relation to the actor’s conduct. Id. at 314.
In this case, the State presented evidence that C.O. died as a result of injuries sustained during the accident. The State, however, must additionally prove that R.V.’s alcohol and marijuana use was a contributing factor that caused the accident which led to C.O.’s death. A review of the record reveals that the State met its burden in this case.
L.P. testified that on the day of the accident, he, R.V. and M.F. smoked marijuana from 1 P.M. until 5 P.M. The toxicology reports from both Ochsner and AIT Labs confirmed the presence of marijuana in R.V.’s system. The Ochsner test revealed that R.V.’s urine specimen tested positive for marijuana at 12:43 A.M. on Sunday, May 2, 2010. In addition, the toxicology analysis performed by AIT Labs in July of 2010 revealed that R.V.’s THC level was measured to be 2.5 nano-grams per milligram and his earboxy THC was measured to be 34.2 nanograms per milligram.
Dr. Kriger testified, however, that the level or quantity of marijuana is not dis-positive in determining impairment. Rather, he opined that recency of use is more indicative of whether a person is impaired. Dr. Kriger opined that because marijuana is stored in the brain, it can still yield impairing effects on behaviors and mannerisms even though it may not be detectable in the blood. He further testified that the impairing effects of marijuana can last up to 24 hours after last use. In this case, Dr. Kriger determined that R.V. had smoked marijuana within 7.92 hours of the accident which was well within the 24-hour time period within which users |1sshow signs of impairment. Based on the time of the blood draw and a calculated recency of use of 7.92 hours, Dr. Kriger opined, within a reasonable degree of scientific certainty, that R.V. was impaired when the accident occurred and that such impairment was a contributing factor in causing the accident.
Dr. George testified regarding R.V.’s blood alcohol level. The first blood draw, which occurred approximately one hour after the accident, indicated that R.V.’s blood alcohol level was .045. Dr. George pointed out, however, that the specimen tested was not a whole blood alcohol level but rather a serum or plasma level. He determined that R.V.’s whole blood alcohol level was actually 57 milligrams percent, which he found to be significant. Dr. George opined that based on R.V.’s whole blood alcohol level and marijuana use, coupled with the recency of use of marijuana, R.V. was impaired when the accident occurred and that such impairment was a contributing factor in causing the accident.
*410 R.V. contends that the first blood draw performed at Ochsner cannot be considered to determine whether he was under the influence of alcohol, because it was done in contravention to the procedures set forth for criminal prosecution. He specifically points to the fact that Ochsner used chloraprep, which is comprised of 70% isopropyl alcohol, as a prepping agent. He argues that the isopropyl alcohol could have contaminated the specimen, which explains why the state crime lab test did not detect ethanol alcohol. R.V. contends that the police draw is more accurate because the nurse used betadine, which contains no alcohol, as a prepping agent. We find this argument unconvincing for several reasons.
First we note that R.V.’s first blood draw was performed approximately one hour after the accident at 12:18 A.M., and the results were ascertained shortly thereafter at 1:18 A.M. The police blood draw, on the other hand, occurred over four hours after the accident at 3:25 A.M., which lends some explanation to the | u variance of the results. Furthermore, that specimen was not tested until nine days after it was drawn. Secondly, Ms. Gardner, the attending emergency room nurse at Ochsner, testified that she ensured R.V.’s arm was dry before inserting the IV in order to prevent the possibility of any contamination. She further testified that any chance of contamination due to the chloraprep were minute. In addition, each person who handled R.V.’s specimen after it was drawn testified that they had no reason to believe the specimen was contaminated. Finally, Dr. Kriger testified that isopropyl and ethanol alcohol were different chemicals which would be differentiated in laboratory testing. We, therefore, find that the record does not support R.V.’s theory that the blood specimen may have been contaminated.
R.V. also argues that the Mustang, as opposed to his intoxication, caused the accident when it cut in front of him. La. R.S. 14:32.1 imposes criminal liability when alcohol or marijuana use is a “contributing factor to the killing.” Therefore, R.V.’s intoxication does not have to be determined to be the sole cause of the accident. Rather, his intoxication need only be a contributing factor that led to the killing.
In State v. Martin, 539 So.2d 1235 (La.1989), the Louisiana Supreme Court determined that proof that the defendant’s conduct was a proximate cause of the victims’ death was sufficient to satisfy the causality requirements. In that case, Martin and Jenkins were participating in a “drag race” near Avondale, Louisiana. Two witnesses testified that Martin was driving between 80-100 mph. Jenkins, the other driver, rear-ended a Chevrolet Blazer. The Blazer flipped over and landed into a canal, killing both of its occupants. Thereafter, Martin’s car hit Jenkins’ car — long after the Blazer was ejected from the road. Martin was convicted as a principal to negligent homicide. The Louisiana Supreme Court affirmed his conviction, noting that the “defendant’s conduct need not be the sole proximate |15cause of the victim’s death.” Id. at 1239. Rather, the Supreme Court determined that the proper inquiry is “[w]as the defendant’s conduct a substantial factor in bring about the forbidden result?” Id. (citation omitted).
In State v. Thomas, 05-2210, (La.App. 1 Cir. 6/9/06), 938 So.2d 168, the court held that the defendant’s intoxication while operating a motor vehicle caused the victim’s death. Like the present case, the defendant in Thomas challenged causation. Thomas argued that ill road conditions, as opposed to his intoxication, caused the accident. In Thomas, however, the court noted that there was sufficient evidence of a causal relationship between Thomas’ *411 blood alcohol level and the victim’s death to support the conviction for vehicular homicide.
In this case, we find that the State proved beyond a reasonable doubt that R.V.’s impairment was a contributing factor that led to the accident which caused C.O.’s death. One witness testified that R.V. had smoked marijuana earlier during the day; while another witness testified that R.V. was drinking alcohol approximately 30 minutes before the accident occurred. In addition, R.V.’s alcohol and marijuana consumption were confirmed in laboratory testing. Finally, we note that both experts testified that R.V.’s impairment was a contributing factor that caused the accident in this case.
In determining the sufficiency of the evidence, the court must determine whether the evidence, viewed in the light most favorable to the prosecution, is sufficient to convince a rational fact finder that all of the elements of the crime have been proven beyond a reasonable doubt, in accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). State ex rel. D.W., 09-855, p. 6 (La.App. 5 Cir. 9/14/10), 47 So.3d 1048, 1053. If the trial court’s findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse, even though convinced that had it been sitting as the trier 11Rof fact, it would have weighed the evidence differently. State ex reí. D.R., supra. Taking into account the totality of the circumstances, we find that there was sufficient evidence for the trial court to adjudicate R.V. delinquent for vehicular homicide. The conviction and sentence are affirmed.
Error Patent Discussion
We have reviewed the record for errors patent in conformity with La.C.Cr.P. art. 920. See State v. Oliveaux, 312 So.2d 337 (La.1975); State v. Weiland, 556 So.2d 175 (La.App. 5 Cir.1990).
We note that R.V. was not advised of the time delay within which to file an application for post-conviction relief.
In the past, this Court has ordered the trial court to properly advise defendant of the prescriptive period under LSA-C.Cr.P. art. 930.8 by written notice within ten days of the rendition of this Court’s opinion and then to file written proof in the record that defendant received the notice. However, in State v. Morris, 40,322 (La.App. 2 Cir. 1/25/06), 920 So.2d 359, 363, the Second Circuit corrected this error patent by way of its opinion rather than a remand. State v. Davenport, 08-463, p. 11 (La.App. 5 Cir. 11/25/08), 2 So.3d 445, 457.
We, therefore, advise R.V. that pursuant to La.C.Cr.P. art. 930.8, no application for post-conviction relief, including applications which seek an out-of-time appeal, shall be considered if it is filed more than two years after the judgment of conviction and sentence has become final under the provisions of La.C.Cr.P. art. 914 or 922.

AFFIRMED

. At the time of the accident, R.V. was on probation for two separate offenses for simple burglary. Pursuant to the first simple burglary offense, he was on active probation until his 18th birthday. In regards to the second, he was on active probation for 18 months.

. Carboxy THC is what the body breaks down the active ingredient in THC to before excretion into the urine or feces.