STATE OF LOUISIANA       *       NO. 2019-KA-0906

VERSUS       *

CHAD M. VIDRINE       *       **COURT OF APPEAL**

      **FOURTH CIRCUIT**

      *       **STATE OF LOUISIANA**

* * * * * * *

APPEAL FROM
CRIMINAL DISTRICT COURT ORLEANS PARISH
NO. 529-048, SECTION "B"
Honorable Tracey Flemings-Davillier, Judge
* * * * * *
**Judge Terri F. Love**
* * * * * *

(Court composed of Chief Judge James F. McKay III, Judge Terri F. Love, Judge
Regina Bartholomew-Woods)

Leon Cannizzaro
District Attorney
Donna Andrieu
Assistant District Attorney
Chief of Appeals
Irena Zajickova
Assistant District Attorney
ORLEANS PARISH
619 S. White Street
New Orleans, LA 70119

      COUNSEL FOR APPELLEE, STATE OF LOUISIANA

Michael Paul Ciaccio
320 Huey P. Long Ave.
P. O. Box 464
Gretna, LA 70054

AND

Frank Gerald DeSalvo
Shannon Regeci Bourgeois
FRANK G. DESALVO, APLC
739 Baronne Street
New Orleans, LA 70113

      COUNSEL FOR DEFENDANT/APPELLANT, CHAD VIDRINE

      **CONVICTION AND SENTENCE AFFIRMED; REMANDED**
      **APRIL 15, 2020**

This appeal arises from the conviction and sentence of defendant for one count of vehicular homicide.

On appeal, defendant contends that there was insufficient evidence to support two elements required for vehicular homicide: 1) that he was legally impaired and 2) that his impairment caused the victim's death. Our review of the trial testimony and evidence revealed sufficient evidence to support defendant's conviction and sentence for vehicular homicide. As such, his conviction and sentence are affirmed. However, we noted an error patent, as the trial court failed to impose a mandatory fine. Accordingly, the matter is remanded for the trial court to impose the mandatory fine.

## *FACTUAL BACKGROUND AND PROCEDURAL HISTORY*

On February 4, 2016, Joseph Sunseri was killed in an automobile collision when a truck, driven by Chad Vidrine, struck the truck in which Mr. Sunseri was a passenger. Mr. Sunseri was ejected from the truck. Mr. Vidrine's blood alcohol concentration was .121. The State filed a bill of information charging Mr. Vidrine with vehicular homicide. Mr. Vidrine appeared for arraignment and entered a plea of not guilty. Following a three-day jury trial, Mr. Vidrine was found guilty of one count of vehicular homicide. Mr. Vidrine filed a motion for post-judgment verdict of acquittal or, in the alternative, a new trial, which the trial court denied.

The trial court imposed "a sentence of fifteen years, with credit for time served, pursuant to Louisiana Revised Statute 14:32.1, all but three years of that sentence are suspended, without the benefit of probation, parole, or suspension of sentence." The trial court further specified that following Mr. Vidrine's release, he would be placed on active probation for a period of three years. He would also be required to install an ignition interlock device on his vehicle. Thereafter, Mr. Vidrine filed a motion for appeal, which the trial court granted.

### *TESTIMONY*

Mary Ann Back, Mr. Sunseri's mother, testified that the victim was her only son. She described her son as "just a great all around guy."

New Orleans Police Officer Daniel Oquendo testified that he was assigned to the Eighth District, which encompasses the French Quarter and the Central Business District. Specifically, he was assigned to the Eighth District C Platoon, which he explained is the "night watch." He stated that on the evening of February 4, 2016, five days before Mardi Gras, he, along with his partner, William Knowles, were driving on Calliope Street. They were stopped at a red light at the intersection of Calliope and Annunciation Streets. Officer Oquendo stated that the light turned green and approximately five seconds later, he heard a loud bang and saw a vehicle "flipping through the air." They immediately proceeded to the accident scene and viewed Mr. Sunseri lying on the ground.

Following the above testimony, Officer Oquendo's body-camera footage was played for jurors, which depicted Mr. Sunseri lying in the street with his head bleeding profusely. The footage also showed an overturned truck. Officer Oquendo proceeded to the truck, assisted the driver out of the truck, and advised

2

him to "stay still." Officer Oquendo then proceeded to check on the occupant of the other vehicle involved in the accident; inquiring as to whether he was injured. He confirmed that the other driver had suffered no injury and returned to the area where the truck was overturned. At that point, a nurse was attempting to assist Mr. Sunseri, advising that he had a faint pulse. Officer Oquendo then collected information from both drivers and secured the scene.

Detective William Knowles testified that on February 4, 2016, he was partnered with Officer Oquendo on the "night watch," which encompassed a twelve-hour shift from 7:00 p.m. to 7:00 a.m. He stated that they were traveling down Calliope Street, approaching the intersection with Annunciation Street, en route to gas pumps to fuel up for the night. He testified that he heard a loud bang, but did not actually witness the crash. Detective Knowles and his partner immediately went to the crash site, where he began the process of obtaining the necessary resources "to control the scene." He explained that it was his duty to secure the scene. He and his partner were not tasked with the responsibility of investigating the accident, as that duty "was passed on to the New Orleans Police Department Fatality Unit."

On cross-examination, the dashboard camera from Detective Knowles' vehicle was played for jurors. When questioned regarding what the video reflected, Detective Knowles testified that he saw "a red stop light controlling the intersection [of Calliope Street and Annunciation Street]." On redirect examination, Detective Knowles confirmed that the video also showed a white line marking the stopping point for the entire intersection. Detective Knowles further

3

stated that on the night in question, there were no other major accidents at the intersection.

Landon Mark Keathley testified that on February 4, 2016, he was employed by "New Orleans EMS as a first responder." On that date, he responded in an ambulance to the scene of an accident at the intersection of Calliope and Annunciation Streets. When he arrived, other medics were performing CPR on Mr. Sunseri, but from EMS Keathley's perspective, "it was time to terminate resuscitation." EMS Keathley contacted a physician so he could relay Mr. Sunseri's condition and have the physician declare a time of death. However, before the doctor made the pronouncement, EMS Keathley was instructed to take Mr. Sunseri to the hospital.

Officer Ralph Palmer testified that he was employed by the Louisiana Department of Public Safety. On February 4, 2016, Officer Palmer was "[w]orking traffic control at Annunciation and Calliope." He stated that he was "[m]anually controlling the traffic light." However, he explained that he could not control how long the light stayed red, green, or yellow. The length of time the light remained red, green, or yellow was controlled by a computer. He pushed a button only to control the cycle of the traffic light. This was done in an effort to ensure that traffic moved smoothly through the intersection.

Officer Palmer stated that he was stationed behind the traffic box located at the intersection and witnessed the accident. Officer Palmer saw a white truck enter the intersection and strike a dark-colored truck and flip it over on its side. He stated that at the time of the accident, "Calliope had the red light and the green light was for Annunciation." Thus, the dark-colored truck traveling on Annunciation

4

Street had the green light and the white truck traveling on Calliope Street had the red light. Officer Palmer testified that after the "crash was cleared out," no one else had an accident at the intersection.

Donovan Perrin testified that on February 4, 2016, he was an Uber driver and he witnessed the accident. Mr. Perrin stated that his car was second in line, waiting to proceed down Annunciation Street when the light turned green. A truck was in front of his car. The light turned green, the truck moved forward, proceeded into the intersection, and "got hit, t-boned on the side and flipped over on the side." Mr. Perrin stated that there was no doubt in his mind that the light was green when the truck moved forward and was struck.

David Sintes testified that he was employed by the Louisiana Department of Transportation and Development and that, on February 4, 2016, he was at the intersection of Calliope and Annunciation Streets. Mr. Sintes stated that he "was sitting in the parking lot on Annunciation under the bridge and [he] saw a truck run an intersection and hit another vehicle." Specifically, Mr. Sintes testified that the "truck that was traveling on Calliope ran a red light and struck the truck that was on Annunciation." Mr. Sintes did not witness any other vehicle go through the red light on Calliope Street that night and there were no other accidents at the intersection.

Dr. Cynthia Gardner, a forensic pathologist employed by the Orleans Parish Coroner's Office, was qualified, without objection, as an expert in the field of forensic pathology. Dr. Gardner testified that she performed an autopsy on Mr. Sunseri and determined that the cause of death was blunt force trauma.

5

Detective Dennis Recasner testified that he was assigned to the Traffic Fatality Unit of the New Orleans Police Department. Detective Recasner explained that his job was to check the braking systems on vehicles to ascertain whether a mechanical failure played a role in a fatal accident. Detective Recasner confirmed that he tested the brakes on Mr. Vidrine's truck and found that the "brake system was working fine."

Kerry Johnson testified that he was employed by "Louisiana State Police Applied Technology," which provides the training for officers tasked with DWI testing. He stated that his employer also maintains DWI equipment. Officer Johnson was questioned with regard to the maintenance of the specific Intoxilyzer 5000, which was used to test Mr. Vidrine. He stated that, by law, maintenance testing on the Intoxilyzer 5000 was performed every four months. Officer Johnson reviewed two certificates of inspection for the pertinent machine: one reflecting that the Intoxilyzer 5000 had been tested on November 11, 2015, and the second reflecting that the Intoxilyzer 5000 was once again tested on February 17, 2016. Officer Johnson explained: "Louisiana law says that any breath testing instrument that's operated within the State of Louisiana has to be within a reference, and that's plus or minus .010." That means that, using .100 as a reference point, an instrument that registers anywhere from .110 to .090 would be considered accurate. However, the manufacturer of the Intoxilyzer 5000 claimed that its machines were more accurate and operated within a range of plus or minus .005, which, using .100 as a reference point, would yield an acceptable reading anywhere from .095 to .105.

As evidenced by the certificates of inspection, the Intoxilyzer 5000 used to test Mr. Vidrine satisfied the above-described standards. The November 2015 testing reflected a readout of .098, placing it at a mark, .002, in Mr. Vidrine's favor. The February 2016 testing reflected no discrepancy between the known value of .100 and the instrument read, which was likewise .100. Thus, in accordance with Louisiana law, the instrument used to test Mr. Vidrine's blood alcohol content was functional.

Officer John Walker testified that from April 2012, until July 2016, he was assigned to the New Orleans Police Department DWI Traffic Division. On February 4, 2016, Officer Walker assisted traffic fatality investigators with the investigation of an accident at the intersection of Calliope and Annunciation Streets. Officer Walker explained that he assisted by ascertaining whether Mr. Vidrine was impaired at the time of the accident. Officer Walker transported Mr. Vidrine from the accident scene to the DWI testing facility.

Officer Walker stated that at the facility, he performed the "Standardized Field Sobriety Test" on Mr. Vidrine, which consisted of "the Horizontal Gaze Nystagmus Test, the Walk-and-Turn Test, and the One Leg Stand Test." The Horizontal Gaze Nystagmus Test requires the suspect to follow a visual stimulus without moving his head. Officer Walker explained that during this test, he was looking for involuntary jerking of the eye (referred to as "lack of smooth pursuit"), which would indicate impairment. Officer Walker stated that Mr. Vidrine lacked a "smooth pursuit in both eyes, and distinct and sustained nystagmus at max deviation in both eyes." Officer Walker explained that such a result indicated that Mr. Vidrine had a blood alcohol content above .08.

With regard to the Walk-and-Turn Test, Officer Walker stated that Mr. Vidrine deviated from the instructions in four areas of the test. Officer Walker explained that two or more errors on the test "is an indicator of someone being under a .08 or higher." Mr. Vidrine was unsuccessful in performing the One Leg Stand Test. Officer Walker testified that Mr. Vidrine failed the test because "[h]e swayed while he was balancing, used his arms to balance, and put his foot down twice." Two or more errors on the test is an "indicator of impairment of a .08 or more."

Following Officer Walker's explanation as to the field sobriety testing, his body-camera footage was published for the jury. This footage depicted Mr. Vidrine undergoing the three tests described above.

Officer Walker stated that, during his interaction with Mr. Vidrine, he could smell the faint odor of an unknown alcoholic beverage emanating from his breath. Officer Walker stated that, in his opinion, Mr. Vidrine was impaired.

After administering the field sobriety testing, Officer Walker explained the chemical testing procedures to Mr. Vidrine. Officer Walker stated that because Mr. Vidrine was involved in a traffic fatality, the law did not permit him to refuse to submit to the chemical test. Officer Walker then explained that the Intoxilyzer 5000 itself performs diagnostic testing to ensure that it is functioning properly before testing is undertaken. Thereafter, Officer Walker administered the intoxilyzer test, which registered Mr. Vidrine's blood alcohol concentration at .121. The legal limit in Louisiana is .08.

On cross-examination, Officer Walker was questioned as to whether he would agree that his body-camera video showed no indications of nystagmus.

Officer Walker agreed, explaining that one "can't see it from the camera." Officer Walker stated he was only able to see nystagmus on a body-camera video on one prior occasion.

Officer Walker was also questioned as to whether Mr. Vidrine's club foot would adversely affect his ability to perform the Walk-and-Turn Test. Officer Walker stated that because he was not a doctor, he did not know whether such a physical deformity would adversely affect the ability to successfully complete the test. With respect to the One Leg Stand Test, Officer Walker testified that Mr. Vidrine balanced himself on his right foot, which was not the foot about which he complained. Therefore, Officer Walker opined that Mr. Vidrine's inability to successfully perform that test could not be attributed to his club foot. Officer Walker also confirmed, on cross-examination, that he could smell the faint odor of alcohol on Mr. Vidrine's breath, that he observed him slur his speech, and that he swayed.

Sergeant Richard Blackman testified that he had been employed by the New Orleans Police Department since 1999, and had been assigned to the Special Events Unit since 2016. Sergeant Blackman explained that he specialized in collecting "CDR" which stands for Crash Data Retrieval. A Crash Data Retrieval system allows technicians to download data from vehicles involved in accidents. A CDR is a monitor that is attached to the airbags in vehicles that determines whether the airbags will be deployed.

Sergeant Blackman stated that he collected the CDR from Mr. Vidrine's vehicle. Thereafter, Sergeant Blackman "processed" the CDR box by "attach[ing] cables to it to a laptop device," then entering information into the device such as

the VIN number of the vehicle and the date of the crash. Once these acts are performed, the next step is to retrieve data from the device. At that point, Sergeant Blackman provided the device to a CDR technician to analyze the collected data.

Sergeant Bernard Crowden testified that he was assigned to the New Orleans Police Department Traffic Division, the Fatality Section. He stated that on February 4, 2016, he, along with other team members, was called upon to investigate the crash, which took place at the intersection of Calliope and Annunciation Streets. Sergeant Crowden explained that he was certified to review the CDR File Information collected with respect to Mr. Vidrine's truck. The CDR data, set forth on page fifteen of the report, reflected that Mr. Vidrine did not apply pressure to his brakes until he was one second away from the crash. Sergeant Crowden stated that this CDR data was corroborated by the evidence he reviewed from the scene of the accident. Sergeant Crowden did not see any skid marks extending from before the red light.

On cross-examination, Sergeant Crowden stated that he did not notice how many traffic lights were at the intersection. He did state, however, that if one of the traffic lights was removed for Mardi Gras, there were still operational traffic lights, such that no other major accidents took place at the intersection during the Mardi Gras season. A photograph of the intersection showing that only two traffic lights, rather than the usual three, were in service on the night of the accident was introduced.

On redirect examination, Sergeant Crowden verified, based on the CDR data, that Mr. Vidrine was traveling at forty-two miles per hour at two seconds

before the crash even though the speed limit on Calliope Street was estimated to be thirty-five miles per hour.[1]

Cody Friedman, the driver of the vehicle struck by Mr. Vidrine's truck, testified that he was a friend of Mr. Sunseri for over twenty years. Mr. Friedman admitted that in the past, he had received two DWIs, but on February 4, 2016, there were no restrictions placed on his ability to drive. Mr. Friedman further stated that when the accident happened, he had not been drinking. He was taken to the hospital and there was no evidence of intoxication.

Mr. Friedman stated that his vehicle was the first one on Annunciation Street, waiting for the red traffic light to turn green. He stated that his truck "cruise[d] through" the intersection, as he did not significantly press down on the accelerator. Mr. Friedman did not recall if his friend, Mr. Sunseri, was wearing a seatbelt.

On cross-examination, Mr. Friedman stated that he did not know how the passenger seatbelt of his truck became buckled underneath Mr. Sunseri. He testified that he does not ride in his truck with the passenger seatbelt buckled. He speculated that someone who washed his truck may have buckled it.

Sergeant Kevin Thompson testified that on February 4, 2016, he was with the Traffic Fatality Unit of the New Orleans Police Department and was assigned to be the lead investigator of the fatal accident. Based on his investigation of the scene, including the condition of the two trucks involved in the accident, Sergeant Thompson concluded that it was a "t-bone collision" with the white Chevrolet Silverado hitting the dark-colored Ford F-150 with such force as to cause the F-150

---

[1] It was unclear what the posted speed limit was for Calliope Street; therefore, the prosecutor asked the witness to assume the speed limit was thirty-five miles per hour.

11

to flip over, ultimately landing on its passenger side.

After examining the vehicles and acquiring witness statements, Sergeant Thompson ascertained that when the crash occurred, the light was green for the F-150 traveling on Annunciation Street and red for the Silverado traveling on Calliope Street. Sergeant Thompson also obtained, from nearby businesses, video surveillance footage. The footage was dark, but based on the headlights, Sergeant Thompson stated that the traffic lights were functioning properly, as cars were stopping on red. Sergeant Thompson testified that in the light cycles before the crash, he did not observe any motorists run the red light.

Sergeant Thompson, based on the CDR data, calculated that in the five seconds before the crash, Mr. Vidrine's average speed was 38.8 miles per hour. Sergeant Thompson further calculated that Mr. Vidrine "traveled a distance of 285 feet within those five seconds prior to impact." So, Mr. Vidrine was 285 feet away when the light turned red on Calliope Street.

Sergeant Thompson was asked whether there were skid marks demonstrating that Mr. Vidrine attempted to stop. Sergeant Thompson responded in the negative, "no skid marks indicating that there was an abrupt attempt to stop or anything like that. Everything was straight through."

On cross-examination, Sergeant Thompson confirmed that all the lights at the intersection of Calliope and Annunciation Streets were functioning properly. He also confirmed that a light was taken down for Mardi Gras. However, he stated that when a light is taken down, officials ensure that "a feasible amount of lights" remain.

Defense counsel asked Sergeant Thompson how close a driver in the left lane would need to be to see the traffic light. He stated that this would vary based upon the individual driver. Moreover, the intersection had multiple traffic signals. Sergeant Thompson stated that Mr. Vidrine would have had five seconds of red light, as well as multiple seconds while the light was yellow, to react. He reiterated that there was no way to determine exactly how close to the intersection a driver would have to be to see the left-most red light because it would depend on a variety of factors. However, Sergeant Thompson testified that the light would be visible before a vehicle crossed the intersection.

Sergeant Thompson stated that a blood test was not performed on Mr. Friedman because he was not responsible for the crash. Sergeant Thompson did not issue a ticket to Mr. Friedman based on the fact that Mr. Sunseri was not wearing his seatbelt at the time of the crash.

Following Sergeant Thompson's testimony, the State played for jurors the body-camera footage worn by Officer Hutchinson, the officer who transported Mr. Vidrine from the DWI Substation to Central Lockup. The State played sixteen seconds of the footage, which showed Mr. Vidrine being transported to Central Lockup following the results of his DWI testing. Thereafter, the State rested.

Claire Hargis, Mr. Vidrine's aunt and a physical therapist, testified that when Mr. Vidrine was born, the doctor's diagnosed him as having "club feet." She stated that both of Mr. Vidrine's feet were afflicted. Immediately after birth, treatment commenced to correct the deformity which led to "surgical reconstruction." Ms. Hargis testified that a "total reconstruction" was performed on the left foot, and "a partial on the right." She stated that as an adult, Mr. Vidrine

suffered from arthritic pain, which affects his "balance." She believed that both of Mr. Vidrine's feet were adversely affected but that his left foot was worse than his right foot.

When Ms. Hargis learned of the accident, she was distressed and shared with a neighbor what occurred. Ms. Hargis then learned from her neighbor that there was a traffic light missing at the intersection of Calliope and Annunciation Streets.

William Schoen testified that he and Ms. Hargis were neighbors. Upon learning that her nephew had been in an accident and where the accident occurred, Mr. Schoen informed her that there was a light missing at the pertinent intersection. Mr. Schoen explained that he is very familiar with the intersection, as he drives through it going back and forth to work. He stated that a driver on Calliope Street could not see traffic traveling from the uptown side of Annunciation Street, explaining that it was "a blind corner."

On cross-examination, Mr. Schoen admitted that one can see there is an intersection at Calliope and Annunciation Streets. Further, one can detect there is an intersection even if you cannot see the cars on Annunciation Street because there are traffic lights.

Mr. Vidrine testified that he lived with his family in Geismar, Louisiana, and his insurance office was located in Metairie, so he did not travel to downtown New Orleans very often. On February 4, 2016, he had a 5:00 p.m. appointment to meet a colleague at Ruth's Chris Steakhouse in downtown New Orleans. Once he arrived, the colleague cancelled the appointment. Because his next appointment was scheduled for 8:30 p.m. in Lakeview, he "decided to stay at the casino to kill a little time." Mr. Vidrine proceeded to play blackjack and drank two alcoholic

drinks while doing so.  By the time the waitress brought him a third drink, he had "doubled [his] money," so he left the table without finishing his third alcoholic beverage.  Thereafter, he dined at the buffet.

After eating, Mr. Vidrine "went to get [his] truck."  Mr. Vidrine testified that when he got in his truck, though he had consumed approximately two and a half alcoholic beverages, he did not feel drunk or even "buzzed."  He did not feel as though his ability to drive had been compromised. He attempted to travel down Canal Street, but it was barricaded.  At that point, he used his "OnStar" computer program to provide him with a route to reach his appointment in the Lakeview area.  Eventually, he was directed to Calliope Street.  At that point, Mr. Vidrine explained what happened up until the crash:

> I came down Calliope.  I stopped at a red light [at Tchoupitoulas Street.]  That light turned green.  I proceeded forward.  I saw the entrance to get on to the interstate, and split seconds before I was approaching the intersection, a truck came and it was in my line of sight.  I hit my brakes last second.  I think I tried to get out the way and move to the right, but it was too late to do anything at that point.

Mr. Vidrine stated that he did not realize he was approaching an intersection between Calliope and Annunciation Streets.  All he saw was the on-ramp to the interstate.

Following the accident, the police reached the scene quickly.  One of the officers asked Mr. Vidrine to move his truck out of traffic, but the truck was not driveable.  Mr. Vidrine was at the accident scene for approximately thirty minutes before he was driven to the DWI testing facility.  He recalled telling Officer Walker, who was administering the DWI testing, that he had club feet, but he did not decline to take the tests.  He stated that he was unaware that he had the option

to decline the testing.

With respect to his club feet, Mr. Vidrine stated that he suffers arthritic pain when the weather is cold. He stated that "[b]alancing is extremely difficult." It was Mr. Vidrine's opinion that his club feet prevented him from correctly performing the tests, which Officer Walker directed. Mr. Vidrine stated that he was surprised at the result, .121 blood alcohol content, of his breathalyzer test. Following the test, Mr. Vidrine was placed under arrest and taken to Central Lockup.

Mr. Vidrine testified that he was very sorry for what happened. However, he reiterated that on the night of the accident, "I did not feel that I was impaired … [a]nd I know when I came up to what we now know is an intersection, there was nothing showing me that I needed to stop whatsoever."

On cross-examination, Mr. Vidrine admitted that he lied to Officer Walker when he informed him that he had not consumed any alcoholic beverages. Mr. Vidrine admitted that prior to this accident, he paid a ticket as a result of a traffic violation conviction. Further, Mr. Vidrine admitted that his club feet did not affect his ability to drive a vehicle.

Upon viewing an enlarged photograph of the intersection at issue, Mr. Vidrine admitted that there was a white line all the way across the intersection and that such a line is indicative of an intersection. Mr. Vidrine further admitted that traffic lights are indicative of an intersection if the traffic lights are visible to the driver. At that point, the prosecutor acknowledged that the light furthest to the left was not present on the date of the accident.

With respect to the Field Sobriety Tests, Mr. Vidrine opined that his club feet adversely affected his ability to perform the Walk-and-Turn Test and the One Leg Stand Test. However, he admitted that his subpar performance on the Horizontal Gaze Nystagmus Test could not be attributed to his club feet. Further, his feet played no role in his score of .121 blood alcohol content on the Intoxilyzer 5000.

Dr. Gary Wimbish was accepted as an expert in the field of forensic toxicology and in the field of administering Standardized Field Sobriety Tests. Dr. Wimbish explained that with the Intoxilyzer 5000, the intent is to take someone's breath to provide a measurement as to their alcohol blood level. Dr. Wimbish stated that the best method to determine the alcohol content of a person's blood is to take a blood sample.

Dr. Wimbish next explained how Intoxilyzer machines work. Specifically, the machine takes a person's breath from their lungs and "make[s] a reading as to what is the actual content of alcohol per unit in the blood." Dr. Wimbish opined that unlike with a blood sample, with a breath test there is a "potential for variability" in the results. This variability comes about because every person is different, and the ratio of air coming in and going out is different for everyone.

Defense counsel played a portion of the video reflecting Officer Walker's interaction with Mr. Vidrine at the DWI testing facility. In watching the video, Dr. Wimbish noted that Mr. Vidrine was "standing politely and waiting on instructions. He wasn't aggressive, he wasn't obtuse, he wasn't trying to over explain." According to Dr. Wimbish, these are signs that Mr. Vidrine was not intoxicated. He explained that alcohol "releases inhibitions to where a person will

17

not regard the social graces as much as they would normally, so they're more aggressive, offensive, and actually obtuse to the wants of the officer, usually." Dr. Wimbish also opined, after watching the video, that he did not find Mr. Vidrine to be slurring his speech.

Next, the video recorded Officer Walker administering to Mr. Vidrine the Horizontal Gaze Nystagmus Test. Dr. Wimbish opined that, based on the camera view, he could not detect the deficiencies to which Officer Walker testified. As for the Walk-and-Turn Test and the One Leg Stand Test, Dr. Wimbish opined that Mr. Vidrine's club feet made him "a non-candidate" for these tests. Further, Dr. Wimbish determined that Officer Walker did not properly administer the tests because he failed to demonstrate the "whole test" to Mr. Vidrine before asking him to perform them.

Dr. Wimbish, upon viewing Mr. Vidrine's interactions with Officer Walker, stated that Mr. Vidrine was clearly experiencing stress. However, "[w]ith alcohol on board," a person's stress level decreases. Dr. Wimbish opined that another sign of alcohol influence is mild euphoria, talkativeness and decreased inhibitions. However, Dr. Wimbish opined that Mr. Vidrine was being "very cautious." Dr. Wimbish elaborated: "With alcohol, you lose the ability to control your speech … slurred speech will come forward. I didn't hear any of it."

Dr. Wimbish concluded that Mr. Vidrine's breathalyzer test result of .121 blood alcohol content did not correspond to how he interacted with Officer Walker. Dr. Wimbish stated that Mr. Vidrine's blood alcohol level, as replicated by the breathalyzer, was commensurate with a person drinking four alcoholic beverages. Dr. Wimbish opined that if a person has four alcoholic beverages, there would be clear signs of intoxication and such signs were not present in this case.

On cross-examination, Dr. Wimbish stated that scientifically, it would be a "blessing" if breath alcohol tests were no longer employed to measure a person's blood alcohol concentration. Dr. Wimbish admitted that not everyone reacts the same to the consumption of alcohol. "Some people get drunk on virtually nothing. Other people with a lifetime experience of abusing alcohol develop some tolerance."

Dr. Wimbish admitted that he owns a consulting firms and he consults on cases at the request of lawyers. However, he stated that he declines to offer his opinion in the majority of cases; he only gets involved "if [he] can help." On re-direct examination, Dr. Wimbish stated that in the past he has offered testimony on behalf of both the prosecution and the defense.

Douglas Robert stated that he worked as a traffic engineer for Jefferson Parish for twenty-nine years and had been qualified in court as an expert in the field of traffic engineering. At that point, the prosecution stipulated to Mr. Robert's qualification as an expert in the field of traffic engineering.

Mr. Robert testified that on the night of the accident, one of the overhead lights at the intersection of Calliope and Annunciation Streets, was removed. The vertically-hanging light was removed so that Mardi Gras floats could be transported under the light. In other areas of New Orleans, specifically, the intersections of Poydras and St. Charles and Poydras and Baronne, the traffic lights are hung horizontally. As such, there is no need for the lights to be removed to facilitate the transportation of Mardi Gras floats.

Mr. Robert stated that in placing traffic signals, one must take into account "the primary reason for the lane." One must think about where the driver is

"heading" and what purpose the driver has in being in a particular lane. After taking this into account, one could "signalize appropriately."

Mr. Robert opined that the signal configuration at the intersection of Calliope and Annunciation Streets did not give the person driving in the ramp lane toward the expressway "precise information about what he's supposed to do at this intersection." He explained that a driver is given precise information by placing traffic signals over the primary lanes.

In the present case, no light signal was above the ramp lane. Further, the light on the post, to the far right of the intersection, was "out of alignment," as "it's angled away from the driver." Mr. Robert stated that if the post-traffic signal had been aligned, the first chance a driver would see the traffic light would be when he or she was "59 feet from the front of a vehicle to the centerline of the movement of the lane of Annunciation … [i]t would be 59 feet from the conflicting car." With that in mind, Mr. Robert stated that a driver traveling thirty-five miles per hour would have one second to brake before hitting a car traveling on Annunciation Street. Based on expert testimony that Mr. Vidrine applied his brakes at one second prior to the crash, Mr. Robert concluded that Mr. Vidrine "had pretty good perception reaction time." It further showed, according to Mr. Robert, that Mr. Vidrine did not disregard the light, but rather, tried to stop as soon as he could.

Thereafter, it was brought to Mr. Robert's attention that Mr. Vidrine, according to the CDR data, was traveling at a greater speed than thirty-five miles per hour. His rate, on average, was approximately thirty-nine miles per hour. Mr. Robert, however, did not fault Mr. Vidrine for going above the speed limit, explaining:

20

I would probably expect higher speeds in the particular lane to go up the ramp for a couple of reasons. One, simply because it's a ramp and that's how we drive when we approach ramps. You know, we see a free movement area ahead of us and we don't see any problems and we accelerate to go forward. The other reason is simply that's an uphill ramp, so you don't want to lose any speed on the ramp going up to I-10.

Mr. Robert testified that he studied a State's exhibit, which, in his opinion, showed two individuals, other than Mr. Vidrine, "running the red [light]" on Calliope Street to get onto the I-10 ramp. Further, based upon his investigation, Mr. Robert stated that the collision was not a straightforward "t-bone" collision; instead, Mr. Vidrine's truck hit Mr. Friedman's truck at a slight angle. This differentiation demonstrated to Mr. Robert that Mr. Vidrine attempted to avoid the collision, turning his vehicle in a rightward direction immediately before impact. In Mr. Robert's opinion, this reaction on the part of Mr. Vidrine reflected "very competent driving" though, at the time he reached this conclusion, he "didn't know Mr. Vidrine's condition."

Mr. Robert stated that if he had been the traffic engineer for the City of New Orleans, he would not have allowed the third traffic signal at the intersection of Calliope and Annunciation Streets to be removed. According to Mr. Robert, there were four accidents, not including the accident at issue, which occurred at the pertinent intersection during the period the third traffic signal was removed. "[T]here were three right angle accidents … and a sideswipe around the ramp…."

On cross-examination, Mr. Robert admitted that the two traffic signals that were functioning on the night of the accident, were visible from Tchoupitoulas Street (one block away from the crash site) from the left on-ramp lane if a driver was looking to his right, taking note of traffic in the adjacent lanes. However, it

21

was Mr. Robert's opinion that for traffic signaling to be deemed adequate, there should be a traffic signal over each lane; that would be his "design preference."

## ERRORS PATENT

La. R.S. 14:32.1(B) provides that "[w]hoever commits the crime of vehicular homicide shall be fined not less than two thousand dollars nor more than fifteen thousand dollars." In sentencing Mr. Vidrine, the trial court did not impose a fine as mandated by La. R.S. 14:32.1(B). This Court has ruled that the failure to impose a mandatory fine requires that the matter be remanded for the imposition of that fine. *State v. Williams,* 03-0302, pp. 3-4 (La. App. 4 Cir. 10/6/03), 859 So. 2d 751, 753. Accordingly, we remand the matter for the trial court to impose the mandatory fine.

## INSUFFICIENT EVIDENCE

### Legal Impairment

Mr. Vidrine contends that there was insufficient evidence to support his conviction on the charge of vehicular homicide because the State failed to prove that he was legally impaired at the time of the accident. Mr. Vidrine challenges the accuracy of his breathalyzer test in determining his blood alcohol content. The result of the testing reflected that he had a blood alcohol content of .121, over the legal limit in Louisiana of .08. According to Mr. Vidrine, the test could not have been accurate because he showed no signs of being intoxicated.

When reviewing the sufficiency of the evidence to support a conviction, Louisiana appellate courts apply the standard enunciated in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the *Jackson* standard, an appellate court shall determine whether, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that the

elements of the offense were proven beyond a reasonable doubt. *Id.*, 443 U.S. at 319, 99 S.Ct. at 2789; *State v. Tate*, 01-1658, p. 4 (La. 5/20/03), 851 So. 2d 921, 928. The reviewing court has to consider the whole record, just as the rational trier of fact considers all of the evidence, and the actual trier of fact is presumed to have acted rationally. *State v. Mussall*, 523 So. 2d 1305, 1310 (La. 1988). "If rational triers of fact could disagree as to the interpretation of the evidence, the rational trier's view of all the evidence most favorable to the prosecution must be adopted." *State v. Egana*, 97-0318, p. 6 (La. App. 4 Cir. 12/3/97), 703 So. 2d 223, 228. "[I]t is not the function of an appellate court to assess the credibility of witnesses or to reweigh the evidence." *State v. Scott*, 12-1603, p. 11 (La. App. 4 Cir. 12/23/13), 131 So. 3d 501, 508, *citing State v. Johnson*, 619 So. 2d 1102, 1109 (La. App. 4th Cir. 1993). "Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the factfinder." *Id.*, *citing State v. Brumfield*, 93-2404 (La. App. 4 Cir. 6/15/94), 639 So. 2d 312, 316. "Moreover, '[c]onflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency.'" *State v. Scott*, 15-0778, p. 9 (La. App. 4 Cir. 6/29/16), 197 So. 3d 298, 304 (quoting *State v. Jones*, 537 So. 2d 1244, 1249 (La. App. 4th Cir. 1989)). "Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness." *State v. Johnson*, 09-0259, p. 9 (La. App. 4 Cir. 9/16/09), 22 So. 3d 205, 211. "Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness's testimony, if believed by the fact finder, is sufficient to support a factual conclusion." *State v. Marshall*, 04-3139, p. 9 (La. 11/29/06), 943 So. 2d 362, 369, *citing State v. Legrand*, 02-1462, p. 5 (La. 12/3/03), 864 So. 2d 89, 94.

The crime of vehicular homicide is defined by La. R.S. 14:32.1, which provides in pertinent part:

> A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance whether or not the offender had the intent to cause death or great bodily harm, whenever any one of the following conditions exist and such condition was a contributing factor to the killing:
> (1) The operator is under the influence of alcoholic beverages as determined by chemical tests administered under the provisions of R.S. 32:662.
>
> (2) The operator's blood alcohol concentration is 0.08 percent or more by weight based upon grams of alcohol per one hundred cubic centimeters of blood.
>
>         *                *                *
>
> (4) The operator is under the influence of alcoholic beverages.

In support of his claim that the State failed to prove that he was impaired at the time of the accident, Mr. Vidrine highlights the testimony, or lack thereof, of the initial responders to the accident scene. Mr. Vidrine asserts that if he had been intoxicated, the officers would have made note of it and relayed that in their testimony.

A review of the testimony of the first responders, Officers Oquendo and Detective Knowles, reflects that contrary to Mr. Vidrine's suggestion, the officers did not have significant contact with him, as he was not injured as a result of the accident. Instead, the officers were focused on the occupants of the other vehicle, both of whom were injured, one fatally. Further, as Detective Knowles testified, it was not their job to investigate the accident, as that was a duty left to the New

Orleans Police Department Fatality Unit. Instead, the first responders were focused on securing the accident scene.

Mr. Vidrine also questions the reliability of his breathalyzer test. In *State v. Winstead*, 16-217 (La. App. 5 Cir. 5/26/16), 193 So. 3d 565, the defendant raised such a challenge. The *Winstead* Court, in finding that "a rational trier of fact could have found the evidence was sufficient with respect to establishing the validity of the Intoxilyzer 5000 test results," took note of the strict regulations imposed to ensure the integrity and reliability of breathalyzer tests and emphasized that the machine at issue had been tested both before and after the defendant's test and found to be in perfectly good working order. 16-217, p. 11, 193 So. 3d at 573. Further, on the date the test was administered, the machine itself performed a diagnostic test to verify it was in good working order. *Id.,* 16-217, pp. 10-11, 193 So. 3d at 572-73. The same is true in the present case.

Mr. Johnson, employed by the Louisiana State Police, testified with respect to the rigorous testing requirements to which the Intoxilyzer 5000 machines are subjected. The machines are tested every four months. The machine used to test Mr. Vidrine was inspected on November 11, 2015, and again on February 17, 2016. It was found to be functioning well within the plus or minus .010 range acceptable under Louisiana law. Additionally, Officer Walker testified that prior to administering the test to Mr. Vidrine, the Intoxilyzer 5000 performed a "self-test," confirming that it was functioning properly. As in *Winstead*, a rational factfinder could have found, based on the above testimony, that the Intoxilyzer 5000 test result, showing Mr. Vidrine with a blood alcohol content of .121, was valid.

25

Mr. Vidrine, in support of his contention that he was not impaired when he ran red lights and collided with the truck, relies heavily on the testimony of Dr. Wimbish, accepted as an expert in the field of forensic toxicology and in the field of administering Standardized Field Sobriety Tests. Dr. Wimbish, in opining that Mr. Vidrine was not intoxicated, did not directly state that the Intoxilyzer 5000 test result was inaccurate. Instead, Dr. Wimbish stated that there was a "potential for variability" in the results of breathalyzer tests, and that Mr. Vidrine's test result of .121 did not correspond to the manner in which Mr. Vidrine was acting.

Dr. Wimbish's assessment of Mr. Vidrine's condition on the night of the accident was not based on first-hand knowledge. Dr. Wimbish did not observe Mr. Vidrine in real time; he was not at the crash site. Instead, his opinion was based on Officer Walker's body-camera footage, footage taken when Officer Walker interacted with Mr. Vidrine at the DWI testing center. According to Dr. Wimbish, because Mr. Vidrine was "standing politely," was "waiting on instructions," "wasn't aggressive," "wasn't obtuse," and "wasn't trying to over explain," that means Mr. Vidrine was not impaired.

Dr. Wimbish's assessment of Mr. Vidrine also runs counter to Officer Walker's impression. Again, it was Officer Walker who was with Mr. Vidrine for a prolonged period of time following the crash. It was Officer Walker, not Dr. Wimbish, who administered the Horizontal Gaze Nystagmus Test and determined that Mr. Vidrine's eye movement was deficient. Dr. Wimbish questioned Officer Walker's finding based on body-camera footage, which cannot be categorized as clear for the purpose of tracking Mr. Vidrine's eye movement. Officer Walker specifically testified that one generally cannot detect a problem with eye movement based on a review of body-camera footage. Officer Walker explained

that on only one prior occasion was he able to make a proper evaluation based on such footage.

Further, Officer Walker was the one who actually spoke with Mr. Vidrine and testified he could smell the faint odor of alcohol on his breath. Dr. Wimbish could not contradict this assessment based on a viewing of body-camera footage. Moreover, Officer Walker's assessment that Mr. Vidrine was impaired was based upon being in Mr. Vidrine's presence, which included Officer Walker questioning Mr. Vidrine about whether he had been drinking and hearing him untruthfully state that he had not consumed alcoholic beverages. Officer Walker, rather than Dr. Wimbish, was in the better position to make an accurate assessment of Mr. Vidrine's sobriety. The law is clear that the testimony of a single witness, if believed, is sufficient to support a factual conclusion. *Marshall,* 04-3139, p. 9, 943 So. 2d at 369. In this case, Officer Walker's conclusion that Mr. Vidrine was impaired is supported by the result of Mr. Vidrine's Intoxilyzer 5000 test.

The validity of Dr. Wimbish's assessment was further undermined by his acknowledgement that different people react differently when they consume alcohol. On cross-examination, Dr. Wimbish testified: "Some people get drunk on virtually nothing. Other people with a lifetime experience of abusing alcohol develop some tolerance." Thus, the fact that Mr. Vidrine did not act "drunk" following the accident did not necessarily mean he was not impaired under the law. As Dr. Wimbish opined, a person may have a high tolerance for alcohol, yet his or her alcohol consumption would be reflected in a breathalyzer test as it was in this instance. Accordingly, we find Mr. Vidrine's assertion that the evidence was insufficient for a reasonable factfinder to determine that he was legally impaired at the time of the accident lacks merit.

*Contributing Cause*

Mr. Vidrine avers that the evidence was insufficient to support his conviction because even if he was legally impaired at the time of the accident, the State failed to prove that his impaired condition was a contributing cause of the accident.

The Louisiana Supreme Court has held "that under the vehicular homicide statute, the state, in order to convict, must prove that an offender's unlawful blood alcohol concentration combined with his operation of a vehicle . . . cause[d] the death of a human being." *State v. Taylor*, 463 So. 2d 1274, 1275 (La. 1985). "It is insufficient for the state to prove merely that the alcohol consumption 'coincides' with the accident." *State v. Archer*, 619 So. 2d 1071, 1074 (La. App. 1st Cir. 1993) (quoting *Taylor*, 463 So. 2d at 1275).

Generally, with respect to causation, in *State v. Kalathakis*, 563 So. 2d 228, 231 (La. 1990), the Louisiana Supreme Court noted:

> A causal relation between the defendant's conduct and the harm for which the prosecutor seeks to impose criminal sanctions is an essential element of every crime. Causation is a question of fact which has to be considered in the light of the totality of circumstances surrounding the ultimate harm and its relation to the actor's conduct. M. Bassiouni, *Substantive Criminal Law*, §§ 5, 5.2 (1978). A defendant should not be held responsible for remote and indirect consequences which a reasonable person could not have foreseen as likely to have flowed from his conduct or from those consequences which would have occurred regardless of his conduct. *Id*.

According to Mr. Vidrine, the evidence presented at trial failed to prove that his operation of the vehicle was "subpar." Mr. Vidrine maintains that "[t]here was no light signal visibly observable to Chad Vidrine, and it is impossible to reasonably conclude that he disregarded what he did not know existed." Mr.

Vidrine states that his "experts scientifically established that it was impossible for [defendant] to have been attentive to those other lanes of travel's light[] signals and at the same time properly navigate his lane of travel." However, a review of the testimony of Mr. Robert, Mr. Vidrine's "traffic engineering" expert, reveals that Mr. Vidrine mischaracterized Mr. Robert's opinion in this regard.

Mr. Robert's testimony, regarding Mr. Vidrine's alleged inability to see the traffic signals, was in connection with the traffic signal on the post, to the far right of the intersection. Mr. Robert stated that the first opportunity Mr. Vidrine, traveling in the far left lane, would have had to see that particular traffic signal would be when he was "59 feet from the front of a vehicle to the centerline of the movement of the lane of Annunciation … [i]t would be 59 feet from the conflicting car." Accordingly, Mr. Robert opined that a driver traveling the speed limit of thirty-five miles per hour would have only one second to brake before hitting a vehicle traveling on Annunciation Street. Thus, Mr. Robert concluded that the accident did not occur because Mr. Vidrine failed to see the light because of his impairment. Instead, the accident occurred because Mr. Vidrine could not possibly have seen the light until one second before impact.

Mr. Robert's testimony reflects he did not testify that Mr. Vidrine could not have seen the overhead traffic signal, which was closer to the lane in which Mr. Vidrine was traveling. In fact, Mr. Robert signified that a driver aware of his surroundings and looking at adjacent lanes of traffic, could see both of the traffic signals that were properly functioning on the night of the accident. The visibility of those signals was reflected in a blown-up photograph of the intersection. The lights might have been unnoticed by an impaired driver solely absorbed in reaching the expressway on-ramp, with no care for the cars in his adjacent right lanes. Mr.

Vidrine essentially admitted that he was such a driver, testifying: "[W]hen I came up to what we now know is an intersection, there was nothing showing me that I needed to stop whatsoever."

Mr. Vidrine makes much of evidence that once he realized, a mere second before impact, that he was on a collision course with Mr. Friedman's truck, he acted appropriately, applying his brake and swerving to the right. However, if Mr. Vidrine had not been impaired, he, like other drivers in the left lane of traffic, might have seen the red lights and stopped. There would have been no need for last-second action to attempt to avoid what, by that point, was an unavoidable and fatal collision. Driving requires dividing attention to make sure one is aware of all traffic lights, signs, and potential hazards, including those in a driver's peripheral vision.

According to Mr. Vidrine, "[t]he critical fallacy underlying the entire prosecution is that no light was there to have been disregarded by Mr. Vidrine." This allegation is simply false. While three traffic lights were not operating at the intersection, it is undisputed that two traffic lights were properly functioning. Further, the traffic lights were visible from the lane in which Mr. Vidrine was traveling. That evidence was not refuted. It was also undisputed that at the time of the accident, the lights on Calliope Street were red; while Mr. Friedman, traveling on Annunciation Street, had a green light. Under these circumstances, the proximate cause of the accident was undisputedly Mr. Vidrine running the red lights on Calliope Street.

Mr. Vidrine contends that "there is no evidence in the record to support the crux of the State's argument," i.e., that Mr. Vidrine should have seen the red lights and stopped. Again, however, Mr. Vidrine is mistaken. First, the traffic lights

30

were visible. Second, there was the testimony of defense witness, Mr. Schoen, who stated that he drove across the intersection frequently, including during Mardi Gras season. Mr. Schoen, on cross-examination, admitted that one can see the intersection at Calliope and Annunciation Streets because there are traffic signals. Third, while Sergeant Thompson could not state with certainty precisely when a driver traveling in the left, on-ramp lane would see the overhead traffic signal, he was certain that the light would be visible before his or her vehicle crossed the intersection. Sergeant Thompson was describing the unimpaired driver, the driver aware of his surroundings, using his peripheral vision to note traffic and a traffic signal in the adjacent lane. Once again, however, Mr. Vidrine, under the influence of alcohol, missed it, stating that "there was nothing showing me that I needed to stop whatsoever."

Mr. Vidrine relies upon Mr. Robert's testimony to the effect that it was his "design preference" to have traffic signals over each lane of traffic and that the absence of a light over each lane failed to provide the driver with "precise information about what he's suppose[d] to do at [the] intersection." Optimally, perhaps, there should have been three traffic signals at the pertinent intersection. However, that Mr. Robert's "design preference" was not followed, does not absolve Mr. Vidrine. Sergeant Crowden provided unrefuted testimony that no other major accidents took place at the intersection during the Mardi Gras season. Sergeant Crowden further testified, based on the CDR data, that Mr. Vidrine was speeding at the time of the crash.

Mr. Robert testified that four other accidents occurred during the Mardi Gras season at the intersection of Calliope and Annunciation Streets, though, admittedly, none were major accidents. According to Mr. Vidrine, three of the four accidents

"occurred in the exact same way that Chad Vidrine's and Cory Friedman's occurred: right angle collisions between a vehicle from the on-ramp Calliope lane with no light signal and a vehicle with a green light traveling on Annunciation." Because the accident reports for these alleged other incidents were not submitted into evidence, there is no way to verify the accuracy of Mr. Vidrine's account.

In the present matter, evidence demonstrated that Mr. Vidrine was impaired; his breathalyzer test reflected that his blood alcohol content was .121; and Officer Walker opined that Mr. Vidrine was impaired. Evidence also showed that Mr. Vidrine was speeding at the time of the crash. Finally, the photograph of the accident site reflected that the traffic signals were visible to drivers in the on-ramp lane.

Next, Mr. Vidrine highlights evidence that Mr. Sunseri was not wearing his seat belt at the time of the collision. Mr. Vidrine maintains that if Mr. Sunseri had been wearing his seat belt, he likely would not have been ejected from the truck's sun roof and would not have suffered multiple blunt force traumas that resulted in his death. Thus, Mr. Vidrine concludes that "the jury could have reasonable doubt that the proximate and direct cause of [the victim's] death was Chad Vidrine's operation of his vehicle, rather than that [the victim's] failure to wear a seatbelt was the proximate and direct cause of his death."

It is well-established that to convict a defendant for vehicular homicide, "the state does not need to prove that the defendant's intoxication was the sole cause of the accident; rather, the defendant's intoxication need only be a contributing factor that led to the killing." *State v. Beene*, 49,612, p. 8 (La. App. 2 Cir. 4/15/15), 164 So. 3d 299, 304, *citing State in the Interest of R.V.,* 11-138 (La. App. 5 Cir.

32

12/13/11), 82 So. 3d 402; *see also State v. Dock,* 49,784, p. 10 (La. App. 2 Cir. 6/3/15), 167 So. 3d 1097, 1103.

In the present matter, a rational juror could find that Mr. Vidrine's intoxicated condition was a contributing factor that led to Mr. Sunseri's death. Mr. Vidrine admitted to having consumed two and a half alcoholic beverages and the State established that he had a blood alcohol content of .121. Evidence was presented that Mr. Vidrine sped through a red light.

In this case, Mr. Vidrine was speeding shortly before impact, focused on the expressway and was traveling at forty-two miles per hour in a thirty-five- mile-per-hour zone. More importantly, Mr. Vidrine, in his impaired condition, failed to notice traffic lights that were visible from the lane in which he was traveling. By his own admission, Mr. Vidrine did not see the traffic lights; failed to recognize that he was at an intersection; and concentrated solely on ascending to the interstate. Mr. Vidrine's actions are sufficient to support the jury's finding that he proximately caused Mr. Sunseri's death and that his .121 blood alcohol content was a contributing factor to the killing.

### *DECREE*

For the above-mentioned reasons, we find the testimony and evidence presented at trial was sufficient to support Mr. Vidrine's conviction and sentence for vehicular homicide. However, as the trial court did not assess the mandatory fine, the matter is remanded to the trial court for the imposition of the mandatory fine.

**CONVICTION AND SENTENCE AFFIRMED; REMANDED**