Judgment rendered April 22, 2020.
Application for rehearing may be filed
within the delay allowed by Art. 922,
La. C. Cr. P.

No. 53,356-KA

COURT OF APPEAL
SECOND CIRCUIT
STATE OF LOUISIANA

* * * * *

STATE OF LOUISIANA                          Appellee

versus

JOSEPH W. MILLER                            Appellant

* * * * *

Appealed from the
Ninth Judicial District Court for the
Parish of Red River, Louisiana
Trial Court No. 133,814

Honorable Lewis O. Sams, Judge

* * * * *

ALAN J. GOLDEN                          Counsel for Appellant


JULIE C. JONES                          Counsel for Appellee
District Attorney

George Winston, III
Assistant District Attorney

* * * * *

Before MOORE, COX, and STEPHENS, JJ.

**MOORE, J.**

After a two-day bench trial, the court found the defendant, Joseph Wade Miller, guilty as charged of vehicular homicide. Miller was adjudicated a second-felony habitual offender and sentenced to serve 20 years at hard labor, the first five years of which to be served without benefit of probation or parole, and to pay a fine of $2,000. Miller now appeals this conviction for vehicular homicide and the court's pretrial denial of his motion to suppress.

For the following reasons, we affirm the conviction and adjudication, but amend the sentence to conform to La. R.S. 15:529.1 (G).

**FACTS**

Between 5:30 and 6:30 a.m. on Tuesday, February 9, 2016, Chris Williamson, a resident of Coushatta, Louisiana, was driving north on La. Highway 1 headed to work when he saw an oncoming southbound vehicle drift into the northbound lane and force the vehicle in front of him off the road. The oncoming southbound vehicle, a green Ford F-150 pickup truck, continued traveling in the northbound lane and ran Williamson off the road onto the shoulder to avoid a collision. Williamson testified that the pickup truck continued traveling south in the northbound lane.

Williamson decided to obtain the license number of the truck to report the incident to police. He turned around and was heading south to catch the truck when the same truck passed him, now heading north. Williamson turned around again, but lost sight of the truck. Minutes later, he saw the green F-150 truck, which he recognized by the large tool box mounted in the back, parked in a driveway. Believing that the driver had made it home, he continued driving to work without reporting the incident.

About 10 minutes later, a coworker called him and told him that there was a bad accident on La. 1 involving a green pickup truck. Williamson turned around and drove back toward the accident site. When he arrived, the site was roadblocked by a law enforcement officer. Believing that the truck in the accident was the same green pickup truck he encountered earlier, he reported that the driver of the truck had run him off the road earlier, and he gave a written statement to that effect.

It was not quite daylight when Jimmy Smith, a resident of Homer, Louisiana, who works in the Coushatta area, was driving north on La. 1 about 100-150 yards behind a car in front of him. He saw the lights of an oncoming vehicle veer across the centerline toward the car in front of him. The car in front of him appeared to bounce around, and its taillights went into the other lane. Smoke and debris evidenced that a collision had occurred. Smith told his passenger to call 911 while he stopped his vehicle and approached the scene.

Smith said that he checked on the driver of a small, grey Pontiac and immediately realized that he was dead. The other vehicle, a dark-colored Ford F-150 pickup with a big worksite tool box in the back, was lodged against the Pontiac. There was a man pinned inside, gurgling and gasping for air. Smith said he later gave his statement to a state trooper.

Red River Parish Sheriff's Deputy Lee Peterson was on patrol that morning when he received a call that a black Ford F-150 was being driven recklessly on La. 1 north. While en route to the area, he received a call about a two-vehicle, head-on collision involving the Ford pickup on La. 1 just north of La. 177. He arrived at the scene and found the two crashed vehicles blocking both lanes of the highway. He could see that the driver in

2

the sedan was deceased. The truck's doors and windows were still intact; the sole occupant inside was moaning as EMS personnel worked to extricate him from the truck. Dep. Patterson began setting up a landing zone for a Life Air Helicopter while EMS was doing their job.

Louisiana State Police Trooper ("LSP") Karan Sharma was riding with his training officer, Trooper Matthew Meeks, at the beginning of his shift that morning. Sharma said they heard on the radio a BOLO ("Be on the lookout") advisory for a pickup truck in Red River Parish swerving all over the roadway. Minutes after the BOLO, another trooper was dispatched to an accident in the same area involving the same pickup truck.

The collision occurred on La. 1 (a segment of US Highway 84) one mile north of La. 177 in Red River Parish. The driver of the Pontiac, Carl Mancil, was killed immediately. The driver of the Ford F-150, Joseph Wade Miller, defendant herein, was seriously injured.

The exact time of the collision appears to be shortly before the dispatch at 6:46 a.m. As state troopers began arriving at the accident scene about 40 minutes later, the unconscious driver of the pickup had been extricated from his vehicle and EMS personnel were preparing him for a helicopter airlift to University Health Medical Center ("University Health") in Shreveport.

The driver of the pickup, identified as Joseph Wade Miller from his vehicle license plate and driver's license, was airlifted at 7:48 a.m. State troopers continued investigating the accident scene and talking to witnesses. Meanwhile, Troopers Sharma and Meek were dispatched to the University Health emergency room where Miller was being treated for the purpose of

obtaining a blood draw pursuant to Louisiana's implied consent statute, La. R. S. 32:681.[1]

Subsequently, the chemical test results revealed the presence of methamphetamine and cannabinoids in Miller's blood. Miller was subsequently arrested pursuant to a warrant for vehicular homicide.

Miller was charged by bills of information with operating his vehicle on a public highway left of the center line, a violation of La. R.S. 32:71B, and with vehicular homicide, a violation of La. R.S. 14:32.1. The latter bill alleged that Miller, on February 9, 2016, did kill Carl Mancil, caused proximately or directly by an offender engaged in the operation of a motor vehicle while under the influence of controlled dangerous substances listed in Schedules I, II, III, IV or V as set forth in La. R.S. 40:964.

Miller filed a motion to suppress the chemical test results arguing that the blood sample used to conduct the test was obtained without a search warrant in violation of his Fourth Amendment right against unreasonable searches, and also obtained in violation of the procedures mandated by the Louisiana implied consent statute. After a hearing, the trial court denied the motion and the case went to a bench trial.

---

[1] **§ 681. Postaccident drug testing; accidents involving fatalities, required**

    A.    The operator of any motor vehicle which is involved in a collision . . . in which a fatality occurs shall be deemed to have given consent to, and shall be administered, a chemical test or tests of his blood, urine, or other bodily substance for the purpose of determining the presence of any abused substance or controlled dangerous substance as set forth in R.S. 40:964 or any other impairing substance.

    B.    The test or tests shall be administered at the direction of a law enforcement officer having reasonable grounds to believe the person to have been driving or in actual physical control of a motor vehicle upon the public highways of this state which is involved in a collision . . . in which a fatality occurs. The law enforcement agency by which such officer is employed shall designate in writing under what conditions the tests shall be administered.

At trial, Miller contended that the evidence was insufficient to prove beyond a reasonable doubt that the blood introduced into evidence was his blood because the toxicology results of the Louisiana State Crime Laboratory showed a different result from the blood taken and tested by University Health. He argued that the state's witnesses, such as the state troopers and the nurse who drew his blood, had memory lapses and could not positively identify Miller in court. Finally, he contended that the evidence was insufficient to exclude the reasonable "probability"[2] of innocence that the accident was not due to the presence of methamphetamine and marijuana in his system, but rather due to fatigue.

Miller assigned two errors on appeal, challenging the trial court's denial of his motion to suppress the evidence obtained from the blood draw, and challenging the court's conclusion that the evidence at trial was sufficient to convict him of vehicular homicide.

As a matter of judicial economy, when an assignment of error is raised on appeal that alleges that the evidence at trial was insufficient to convict along with one or more other assignments of error, the reviewing court always evaluates the sufficiency of the evidence question first, irrespective of the specific order of assignments of error raised and argued by the appellant. *State v. Hearold*, 603 So. 2d 731 (La. 1992). Therefore, we will consider Miller's second assignment first.

## SUFFICIENCY OF EVIDENCE

By his second assignment of error, Miller alleges that the trial court erred when it found the defendant guilty of vehicular homicide because (1)

---

[2] We are unsure if Miller intended "hypothesis" here.

5

the verdict was contrary to the law and evidence and (2) the evidence failed to prove beyond a reasonable doubt that defendant was under the influence of a controlled dangerous substance that was a contributing factor to the killing.

First, Miller contends that the state failed to prove beyond a reasonable doubt that the blood admitted into evidence was actually his blood. Although the state introduced blood that was purportedly drawn from Miller, there were significant discrepancies and lapses in the identification process by the people involved in taking the blood sample.

Jeremy Neal, a Red River EMS employee, responded to the accident. He and a paramedic extricated Miller from his truck, and then cut open his clothes while the unconscious Miller was on a stretcher. His partner removed Miller's wallet and placed Miller's driver's license on his bare chest, where it remained when he was loaded onto the helicopter.

Miller was unconscious when he arrived at the emergency room at University Health. The blood was drawn by Nurse Phillip Mullins at Trooper Sharma's request. At trial, Nurse Mullins could not recall whether Miller had a driver's license on him, and stated that "we don't usually have a driver's license on these people." When asked how he determined the identity of the patient Joseph Miller, he replied, "That's – not a job I would have. We don't identify any patients." If a trauma patient does not have a hospital bracelet with his name on it, he said, the patient would be identified by a Greek letter with the number 51, e.g. Eta 51 or Beta 51.

Trooper Sharma testified that when he ordered the blood to be drawn, he relied on Nurse Mullins and the hospital staff to identify Miller for purposes of drawing blood. He never saw Miller's face. Miller argues that

6

Trooper Sharma's testimony is at odds with Nurse Mullins's testimony, characterizing the latter as stating that he would not have known the identity of the person whose blood he was drawing, but only as "Alpha 51."

To cast further doubt on the authenticity of the blood sample, Miller argues that the state blood sample test results admitted at trial differed materially from a hospital test of blood drawn from him for treatment purposes.[3] The blood drawn by University Health contained amphetamines, cannabinoids, and benzodiazepines, whereas the blood drawn at Trooper Sharma's request from the patient purportedly identified as Miller contained only methamphetamine and cannabinoids. The state's test did not contain benzodiazepines, and, Miller argues, the state could not explain the different results.

The second sufficiency of evidence argument Miller makes is that the evidence failed to exclude the reasonable hypothesis that it was fatigue and not drugs that caused him to fall asleep while driving and veer into the oncoming lane of traffic, causing the collision that killed Mr. Mancil. The drugs present in his system, he maintains, were ingested more than two days prior to the accident, and did not contribute to the accident. He argues that the state's forensic toxicologist, Dr. Fleming, could not rule out the possibility that Miller last ingested marijuana and methamphetamine 36 hours prior to the accident and fatigue could have produced the same effects as those two drugs, causing him to drift outside his lane.

The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to

---

[3] The ER staff performed a blood test for drug interaction purposes since Miller was in a coma and unconscious.

the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979); *State v. Tate*, 01-1658 (La. 5/20/03), 851 So. 2d 921, *cert. denied*, 541 U.S. 905, 124 S. Ct. 1604, 158 L. Ed. 2d 248 (2004); *State v. Carter*, 42,894 (La. App. 2 Cir. 1/9/08), 974 So. 2d 181, *writ denied*, 08-0499 (La. 11/14/08), 996 So. 2d 1086.  This standard, now legislatively embodied in La. C. Cr. P. art. 821 is applicable in cases involving both direct and circumstantial evidence.  An appellate court reviewing the sufficiency of evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution.  When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime.  *State v. Sutton*, 436 So. 2d 471 (La. 1983); *State v. Robinson*, 50,643 (La. App. 2 Cir. 6/22/16), 197 So. 3d 717, *writ denied*, 16-1479 (La. 5/19/17), 221 So. 3d 78.  Where a conviction is based on circumstantial evidence, as is the case here, the evidence "must exclude every reasonable hypothesis of innocence." La. R.S. 15:438.

The requirement that jurors reasonably reject the hypothesis of innocence advanced by the defendant in a case of circumstantial evidence presupposes that a rational rejection of that hypothesis is based on the evidence presented, not mere speculation. *Id.*; *State v. Schwander,* 345 So. 2d 1173, 1175 (La. 1978).  The *Jackson* standard of review does not allow a jury to speculate on the probabilities of guilt where rational jurors would

8

necessarily entertain a reasonable doubt. *State v. Leger*, 17-2084 (La. 6/26/2019), 284 So. 3d 609, 617.

The appellate court does not assess the credibility of witnesses or reweigh evidence. *State v. Smith*, 94-3116 (La. 10/16/95), 661 So. 2d 442. A reviewing court accords great deference to the jury's decision to accept or reject the testimony of a witness in whole or in part. *State v. Casaday*, 49,679 (La. App. 2 Cir. 2/27/15), 162 So. 3d 578, *writ denied*, 15-0607 (La. 2/5/16), 186 So. 3d 1162.

Vehicular homicide is defined by La. R.S. 14:32.1 which provides, in pertinent part:

> A.  Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever the following condition existed and such condition was a contributing factor to the killing:
>
> * * *
>
> (3) The operator is under the influence of any controlled dangerous substance listed in Schedule I, II, III, IV, or V as set forth in R.S. 40:964.
>
> * * *
>
> (7) the operator's blood has any detectable amount of any controlled dangerous substance listed in Schedule I, II, III, or IV as set forth in R.S. 40:964, or a metabolite of such controlled dangerous substance, that has not been medically ordered or prescribed for the individual.

After review, we conclude that Miller's argument that lapses and inconsistencies in the testimony cast doubt on whether the state actually tested Miller's blood is without merit.

9

Jeremy Neal, the Red River EMS paramedic team worker who responded to the accident, testified that once he and the paramedic removed the driver from the Ford F-150, they placed him on the backboard, then onto a stretcher, and loaded him into the back of the ambulance. He said that the driver was unresponsive. Once in the ambulance, Neal and the paramedic began cutting the driver's clothes off; the paramedic removed the driver's wallet. He took photographs of Miller's driver's license and placed the driver's license on Miller's chest where it remained while he (Miller) was loaded into the helicopter.

Phillip Mullins Jr., R.N., testified that he has worked at University Health for 25 years, the last 11 in the ER where he performed 11 to 15 blood draws a day, both routine and for law enforcement. He was working on February 9, 2016, and he identified Ex. 13 as a blood draw kit used by police and which was introduced into evidence at the suppression hearing. He identified his signature on the blood vials inside the kit. He stated that the police are always present when blood is drawn.

All evidence from the suppression hearing was admitted into evidence without objection. Mullins identified Ex. 11, which is a slip or form that comes with the blood draw kit and which was signed and dated by him for the subject, Joseph Miller.[4] He identified Ex. 12, a police form that stated that the blood was drawn by him.

Nurse Mullins said that *he did not remember from three years ago* how he identified Miller. Since then, he had seen Miller a number of times

---

[4] At the motion to suppress hearing, Mullins identified Ex. 11 as a slip that comes with the police blood collection kit and identified the signature on the slip, "P. Mullins," as his own.

(at the motion to suppress), so he could not say one way or the other whether he recognized Miller now based solely on the February 9, 2016, blood draw. He also could not remember if Miller had a driver's license on his chest; unconscious patients typically do not have their driver's license with them. Patients usually have a hospital wrist band for identification, or, as noted above, unknown patients were designated by a Greek alphabet and number, e.g., "Eta-51."

Trooper Sharma had never seen Miller when he went to the hospital for the blood draw. He testified that he requested the blood draw, and he was present when Nurse Mullins drew the blood sample. He did not remember if he saw Miller's face. He relied on the nursing and hospital staff to identify Miller for purposes of the blood draw; he assumed they identified him as Miller from his ID in his wallet. He further said that he relied on Nurse Mullins who told him that the patient in the room was Joseph Miller.

Frankly, we do not find Nurse Mullins's inability to say that he recognized Miller in court based solely on his faded memory of a particular blood draw three years ago – one among hundreds of the blood draws since – creates any identity issue. The question is not whether Mullins remembered Miller's face in court solely from the blood draw, but whether the patient from whom Nurse Mullins drew the blood was Miller. Nurse Mullins simply could not remember how he knew the patient was Miller. He testified that Miller would either have had a hospital bracelet identifying his name or a Greek letter/number assigned to him until identified by name. Nurse Mullins clearly explained the protocol for law enforcement blood draws. Based on the exhibits in the blood draw kit, Mullins clearly followed

11

that protocol, identifying his own name, handwriting, and signature on the forms and tubes. These procedures have proven to be reliable.

Although Trooper Sharma testified that from where he was standing in the room he did not see Miller's face when the blood was drawn, he relied on Nurse Mullins to draw the blood from the patient identified as Miller and said Mullins told him it was Miller. Nurse Mullins did not recall either way. We do not find Nurse Mullins's testimony problematic when he said that "it was not his job to identify patients." Nurse Mullins was simply stating that, as an ER nurse, it was not his job to determine the name of a patient, e.g., for purposes of making an ID bracelet. Miller is equivocating two different uses of the word "identify," namely, (1) to establish the identity (i.e., name) of an unknown person or thing, or (2) to recognize someone, e.g., as the person who robbed him in a lineup.

Miller also argues that a discrepancy between the state lab and hospital lab reports casts doubt on the authenticity of the state's blood draw sample. The hospital blood screen test showed positive for amphetamines, benzodiazepines, and cannabis. The state lab drug screen showed methamphetamine and tetrahydrocannabinol (THC or cannabis) in the specimen of blood labeled Joseph Wade Miller. Miller argues that the state could not account for absence of benzodiazepines in the state tests and contends that this discrepancy in the state lab test casts doubt whether the blood tested was his blood. The testimony in this regard is inconclusive.

Derrick Morgan, an LSP crime lab ("crime lab") employee at the time the tests were performed, testified that the test would have screened for benzodiazepines, but there is no such indication on the state test that was put into evidence.

12

Blake Stutzman testified that he also worked for the crime lab as a forensic scientist in the toxicology section. He participated in Miller's drug screen test. He said that he believes that he screened for benzodiazepines; however, he no longer works for the crime lab and does not have access to the file. He stated, however, "if there was a positive benzodiazepine detected in the confirmation[,] that would have shown as well."

The state argues that because the hospital record does not list the amounts of CDS in Miller's system, or give a reference range for the amount of each drug it tests, it does not present an issue. It is possible, the state contends, that the hospital tested for a lower level of benzodiazepines than did LSP's crime lab (i.e., a more sensitive test), and that is why benzodiazepines did not show up in the crime lab report. The state further argues that Miller did not flesh this issue out at trial, and the trial court did not believe this "discrepancy" called into question the chain of custody or the reliability of the evidence.

We conclude that the apparent absence of benzodiazepines on the state test and their presence on the hospital blood screen, without any expert testimony explaining the significance of the discrepancy, if any, does not raise an issue of fact regarding the authenticity of the blood sample. For this reason, we rely on the established protocol and chain of custody of Miller's blood sample to authenticate the blood sample as that of the defendant, as did the trial court. We find no error in the trial court's conclusion that the LSP crime lab blood sample test results were authenticated.

In the second part of his sufficiency of evidence assignment, Miller argues that the evidence failed to exclude the reasonable hypothesis that it

was fatigue, not the presence of a CDS, that caused him to veer into the oncoming lane of traffic.

The plain text of the statute requires the state to prove four elements in this case: (1) the killing of a human being; (2) caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle; (3) intoxication or impairment from a CDS on the operator or the presence of a CDS in the bloodstream; and, (4) a link between the influence or presence of the CDS and the killing. Most importantly, the link between the influence of the CDS or its presence in the bloodstream does not have to be a "proximate cause," but simply a "contributing factor." *State v. Leger, supra* at 616 ("the link between the intoxication and the killing does not have to be a 'proximate cause,' but simply a 'contributing factor.'"); *State v. Beene*, 49,612 (La. App. 2 Cir. 4/15/15), 164 So. 3d 299, *writ denied,* 15-0944 (La. 4/4/16),190 So. 3d 1200; *State in the Interest of R.V.*, 11-0138 (La. App. 5 Cir. 12/13/11), 82 So. 3d 402.

At trial, Miller gave his account of his drug use and the events leading up to the accident. He testified that he smoked marijuana and methamphetamine at a party that lasted from Saturday night through Sunday morning. He took a Xanax on Sunday afternoon to help him sleep. On Monday, he left for work at 5:00 a.m. and drove to Many, where he worked a 12-hour shift doing "welding and connecting" until 6:00 p.m.

Sometime between 9:00 and 9:30 p.m. Monday night, Miller went to visit his girlfriend, Brittany Duque, who lived with her grandmother, Linda Bryant. He spoke with Ms. Bryant for a while, "fixed himself a plate" and brought it to Brittany's bedroom to eat. He fell asleep watching a movie

about 11:00 or 11:30 p.m. Ms. Bryant awakened him at 4:30 a.m. to go to work.

Miller testified that he stopped for breakfast at a truck stop, ate, and then resumed driving south on La. 1. While driving, he fell asleep at the wheel, but awoke finding himself driving in the oncoming lane from which he swerved over hard. To gather his wits, he pulled into the first driveway he saw, parked his truck, got out, and smoked a cigarette. He called his boss informing him that he would be a little late. He remained parked for about 10 minutes until he felt "good to go." Then he got back in the truck and resumed driving. His next memory, Miller said, was waking up in the hospital.

Ms. Bryant, Brittany's grandmother, corroborated Miller's account of the night before. She was familiar with Miller's behavior when he was high on or coming off methamphetamine, and she said he exhibited none of those behavioral symptoms Monday night. His speech was perfect and his gait was normal, she testified. She ruled out any possibility that Miller and Brittany could have smoked methamphetamine or marijuana during the night.

Miller's hypothesis of innocence is that it was fatigue that caused him to fall asleep at the wheel of his truck and veer over into the lane of oncoming traffic, causing the death of the victim. He does not dispute that the state established the first two elements of vehicular homicide, namely, the killing of a human being caused proximately or directly while he was engaged in the operation of a motor vehicle.

Miller admits that he ingested the two drugs found in his bloodstream, but maintains that this usage occurred two days prior to the accident and

15

they no longer affected him; he worked a 12-hour day on Monday; Ms. Bryant corroborated that he did not exhibit behavior symptomatic of coming off a methamphetamine high – behavior she was familiar with – Monday night, the evening before the accident. Hence, the lingering presence of CDS in his bloodstream two days after ingestion does not exclude the reasonable hypothesis that it was fatigue from working long hours at work and getting relatively little sleep, and not drugs, that caused him to fall asleep at the wheel.

In *State v. Leger, supra*, the Louisiana Supreme Court reversed an appeals court judgment that modified a defendant's conviction of five counts of vehicular homicide to negligent homicide after concluding the state did not establish that the defendant's intoxication was a contributing factor to the fatal accident as required by R.S. 14:32.1. After review, the *Leger* court found that the state's evidence established the link between defendant's intoxication and the killing sufficient to support the convictions for vehicular homicide and reinstated the convictions. A detailed discussion of this recent case from our supreme court is useful for our consideration here.

In *Leger*, the defendant's westbound pickup truck crossed the I-10 median into oncoming eastbound traffic, colliding with an 18-wheeler and then colliding with the victims' vehicle, killing all its occupants. Prior to the collision, Leger was engaged in a high speed, "cat and mouse" chase with another vehicle driven by Kelsye Hall, apparently arising from road rage. Witnesses said that over a distance of several miles, Hall prevented Leger from passing her, while Hall testified that Leger was closely tailing her with his high beams on her. The accident was triggered when Leger tried to pass Hall on the interstate shoulder. The left rear of Leger's pickup truck

16

collided with the right front of Hall's vehicle, causing the truck to change direction, cross the interstate toward the median, rotate counterclockwise through the median, and exit into the oncoming eastbound lanes where he collided with two vehicles.

Leger voluntarily gave a blood sample at the hospital two hours after the crash. The blood test showed a blood alcohol concentration ("BAC") of 0.10 percent. Police found a capped bottle of Captain Morgan rum in the mangled pickup truck. A state trooper investigating the accident could not articulate any facts such as an odor of alcohol or behavioral manifestations of intoxication. Leger submitted to a breathalyzer test that showed no indication of alcohol consumption. However, he stipulated at trial that a test showed his BAC was 0.10. On the other hand, Hall's BAC was clear.

Defendant's sole witness was an expert in accident reconstruction who opined that the sudden redirection of defendant's truck was caused by the collision with Hall's vehicle and that no person, drunk or sober, could avoid the change in direction that resulted. In other words, Leger's handling of the vehicle after the collision did not cause the truck to cross over to the median, rotate counterclockwise, and enter the eastbound lane.

Nevertheless, the jury found Leger guilty of five counts of vehicular homicide. The court of appeal, however, concluded that the state failed to carry its burden of proving that the defendant's intoxication was a contributing factor to the deaths of the five victims. Although the defendant was intoxicated, "it found that the jury did not have further evidence as to defendant's appearance, observable signs of impairment, the effect of such a blood alcohol level upon a reasonable person, or other evidence from which to reasonably infer beyond a reasonable doubt that the defendant's

17

intoxication was a contributing factor to this collision." *Id.* at 612. Concluding that the defendant's actions were sufficient to support convictions for the lesser crime of negligent homicide, it modified the verdicts and vacated the sentences accordingly. The supreme court granted the state's writ application.

On review, the court emphasized that under the vehicular homicide statute, the link between the intoxication and killing does not have to be a proximate cause – only a contributing factor. A proximate cause is one that directly produces an event and without which the event would not have occurred. A contributing cause or factor is not a primary cause but plays a part in producing a result. *Id.*

The court stated that in a vehicular homicide case, the exact nature of the proof will vary on a case-by-case basis. In a *case involving a prohibited substance other than alcohol, the state would likely need to introduce expert testimony concerning the physiological effects of the intoxicant ingested. Id.* at 616. In other cases, e.g., *loss of consciousness while driving causing an accident – proof of the BAC and associated acts would almost certainly prove sufficient. Id.; cf. State v. Heins*, 51,763 (La. App. 2 Cir. 1/10/18). 245 So. 3d 1165.

The appellate court said it modified Leger's vehicular homicide convictions to negligent homicide because the state did not introduce any evidence of the defendant's behavioral manifestations after the collision with Hall's vehicle that sent his truck across the median. The same result from that collision would have ensued even had Leger been sober, the expert evidence showed. Hence, since Leger was no more negligent than the unintoxicated Hall up to and including the collision with her vehicle, the

18

appellate court concluded that the evidence did not causally link Leger's intoxication to the killing.

On review, however, the supreme court stated that the compelling circumstantial evidence of Leger's aggressive behavior prior to the collision with Hall, including driving erratically and at a high speed, flashing his bright lights, and his ill-fated attempt to pass Hall on the right partially on the shoulder, created the link between intoxication and the accident. The jury could have reasonably inferred that Leger's intoxication was a contributing factor in the sequence of events that led to his truck colliding with Hall's vehicle, crossing the median, slamming into two vehicles and killing five persons.

Leger's hypothesis of innocence was that his intoxication could be forgiven and was not a contributing factor to the deaths because the unintoxicated Hall engaged in equally combative behavior. The jury, the court said, rejected this hypothesis when it rationally concluded that Leger's intoxication spurred his aggressive behavior or refusal to back off from the dangerous situation, or both.

Accordingly, the evidence was sufficient to show that Leger's intoxication was a contributing factor in the deaths of the five victims. The jury's finding that Leger's intoxication led to that aggressive behavior was reasonable. It vacated the judgment of the court of appeal, reinstated the trial court judgment, and remanded to the court of appeal to consider the pretermitted assignments of error.

In this case, Miller presents arguments closely analogous to those in *Leger, supra.* Miller contends that the presence of CDS in his bloodstream could be forgiven and was not a contributing factor because negligent

driving while fatigued (like the negligent driving of the unintoxicated Kelsye Hall) could not be ruled out as the factor that caused him to fall asleep at the wheel, leave his lane, and collide with Mr. Mancil's vehicle. At trial, however, the state introduced circumstantial evidence of Miller's behavioral manifestations of impairment from witnesses, and introduced expert testimony concerning the effects of the intoxicants he ingested.

The state tendered Dr. Steven Wayne Fleming, of the North La. Crime Laboratory, as an expert in the field of forensic toxicology. Dr. Fleming testified that he reviewed the LSP crime lab report and the NMS Lab of Pennsylvania report, 12 of the motion to suppress exhibits, and Miller's medical records. Dr. Fleming testified regarding the analysis and reports run by LSP crime lab and NMS lab and findings therein.

Dr. Fleming testified that the levels of THC, the main psychoactive component of marijuana, in Miller's bloodstream were consistent with recent use of marijuana. Dr. Fleming testified that THC has about a four-hour window, where it is noticed above 1 nanogram per milliliter (ng/mL). Miller had 2.4 ng/mL.

Dr. Fleming testified that Miller's blood had 470 ng/mL of methamphetamine. Methamphetamine abuse is evident, he said, whenever the levels are about 200 ng/mL. Importantly, methamphetamine intoxication has two phases: first, a euphoric phase that occurs upon ingestion of the drug, heart rate and pulse are increased, pupils dilate and the user is more excited; second, commonly called the crash, or the withdrawal phase, the drug presents itself more like a CNS (central nervous system) depressant, where the user is hypersomnolent (uncontrollably falling asleep), tired, fatigued, and lethargic, akin to taking Xanax, a depressant. While there are

20

no published reports regarding dosage studies, Dr. Fleming testified that in studies of case histories, a majority of drivers on the drug typically went across the lane, and swept out of the lane. Drifting into the other lane, as Miller did, is consistent with methamphetamine impairment. Dr. Fleming confirmed that driving behavior associated with methamphetamine concentrations above 200 ng/mL includes driving in the other lane, decreased hand-eye coordination, and a slower ability to react.

Dr. Fleming testified that one's blood concentration would change significantly between 6:46 and 9:04 a.m., with respect to THC and methamphetamine. Miller's blood concentration levels were consistent with abuse. Given the level of methamphetamines, he said that it is likely that use definitely occurred within the previous 24- to 48-hour period, but was unlikely within a 72-hour period. Dr. Fleming testified that "within a reasonable degree of scientific certainty that this level of methamphetamine with the reports from the individual in the arresting reports, crossing the lane is consistent with the withdrawal effects in the second phase."

Dr. Fleming testified that it is possible that Miller last ingested marijuana and methamphetamines 36 hours before the accident. He said, however, that having 470 mg/mL of methamphetamines in the system, as Miller did, would have an effect on a driver, and that it has been shown that at that concentration it may cause impairment. Even the manufacturer of methamphetamines suggests that a person should not be operating a vehicle with 470 mg/mL of methamphetamine in their system. Dr. Fleming testified that, with a reasonable degree of scientific certainty, he believed that methamphetamine and marijuana abuse played a role in the accident.

21

The state offered testimony from Chris Williamson, who observed Miller's truck run a driver off the road by entering the lane of oncoming traffic and then remained in that oncoming lane both before and after he also ran Williamson off the road.

Trooper Sharma testified that the BOLO for a pickup truck driving erratically in Red River Parish indicated that someone other than Williamson had also witnessed Miller's erratic driving.

Finally, Jimmy Smith testified that he was behind the victim's vehicle when he saw Miller's pickup truck swerve over into the oncoming lane and was witness to the accident.

As previously stated, Miller contends that the presence of fatigue, and not CDS impairment, caused him to fall asleep, swerve into oncoming traffic, and kill the victim. Falling asleep at the wheel caused by fatigue, he argues, cannot be distinguished from falling asleep at the wheel due to the crash phase of methamphetamine abuse, and therefore does not rule out his reasonable hypothesis of innocence.

To find the defendant guilty beyond a reasonable doubt, the factfinder must reasonably reject the hypothesis of innocence advanced by the defendant based on the evidence presented, not mere speculation. *State v. Leger, supra; State v. Schwander, supra*. The factfinder has the discretion in deciding what inferences to draw from the evidence, subject to the requirement that the inferences drawn are reasonable. *Coleman v. Johnson,* 566 U.S. 650, 655, 132 S. Ct. 2060, 2064, 182 L. Ed. 2d 978 (2012); *State v. Leger, supra*.

Miller testified that he attended a party held on the Saturday through Sunday morning two days prior to the accident early Tuesday morning,

22

smoking marijuana and methamphetamine at the party, and then took a Xanax on Sunday to help him sleep. He went to work on Monday morning and spent the night with his girlfriend, getting approximately 5½ hours' sleep before going to work. He stopped and had breakfast on the way. After breakfast, he continued to drive to work. He realized he was falling asleep at the wheel and pulled off the highway to gather himself. After he resumed driving, his next memory was waking up in the hospital.

The state introduced expert testimony regarding the levels of methamphetamine and THC in Miller's bloodstream and the effects of those levels. Some of the prominent symptoms Dr. Fleming testified about 24 to 48 hours following ingestion included hypersomnolence and fatigue. Other evidence included testimony that Miller ran several vehicles off the road; he continued driving on the wrong side of the road even after running Mr. Williamson off the road; he decided to continue driving after he stopped to pull himself together after previous incidents occurred, and shortly afterward caused a collision killing Mr. Mancil by leaving his lane and swerving into oncoming traffic. This latter testimony alone could easily have led the factfinder to conclude that Miller's behavior was not solely, if at all, the result of fatigue from getting only 5½ hours of sleep after working 12 hours the day before, but the likely result of mental impairment from the crash phase of methamphetamine. Miller's blood samples taken 2 hours after the accident showed the presence of CDS in Miller's blood at a level showing abuse. The analysis of the results by Dr. Fleming revealed the presence of THC in quantity that indicated Miller recently (within 4 hours) smoked marijuana and that he ingested methamphetamine within 36 hours, although in a highly concentrated amount.

23

Based on the evidence of Miller's behavioral manifestations while driving and expert testimony regarding the CDS found in the blood analyses, we conclude that the court reasonably rejected Miller's hypothesis of innocence that the presence of fatigue caused the collision that killed Mr. Mancil.

The state presented sufficient evidence for the factfinder to find that the presence of CDS in Miller's bloodstream was a contributing factor in the death of Mr. Mancil beyond a reasonable doubt where Miller swerved his pickup truck into the oncoming traffic lane causing the fatal head-on collision.

Accordingly, this assignment is without merit.

**MOTION TO SUPPRESS**

By his first assignment of error, Miller argues that the trial court erred in denying his motion to suppress the warrantless search and seizure of the defendant's blood in violation of the Fourth Amendment protections against unreasonable searches. Miller presents two main arguments. First, he argues that the failure to obtain a warrant to obtain a blood sample from him violates the Fourth Amendment where there are no exigent circumstances. Second, he argues that the state police failed to comply in two ways with the requirements of the implied consent statute, namely, La. R.S. 32:681(B) and La. R.S. 32:681(D).

The U.S. Supreme Court held that a blood draw is a "search" for Fourth Amendment protection purposes that requires a warrant absent certain exceptions, one of which is the "exigent circumstances" exception. *Birchfield v. North Dakota*, 136 S. Ct. 2160, __ U.S. __, 136 S. Ct. 2160, 195 L. Ed. 2d 560 (2016). Under the exception for exigent circumstances, a

24

warrantless search is allowed when "there is compelling need for official action and no time to secure a warrant." *Missouri v. McNeely*, 569 U.S. 141, 133 S. Ct. 1552, 185 L. Ed. 2d 696 (2013) (quoting *Michigan v. Tyler*, 436 U.S. 499, 509-510, 98 S. Ct. 1942, 56 L. Ed. 2d 486 (1978)). Miller argues that in the instant case, the LSP elected to forgo a warrant application simply because they believed a warrant was not legally necessary under Louisiana's implied consent law, even though a warrant could have been easily obtained. Thus, the seizure of his blood without a search warrant was not justified by time constraints or other pressing needs, and therefore constituted an unreasonable search and seizure under the Fourth Amendment.

We review a trial court's ruling on a motion to suppress under the manifest error standard with regard to factual determinations, as well as credibility and weight determinations, while applying a de novo review to findings of law. *State v. Manning*, 51,450 (La. App. 2 Cir. 8/9/17), 244 So. 3d 600, *writ denied*, 17-1575 (La. 5/18/18), 242 So. 3d 575. A trial court's denial of a motion to suppress is afforded great weight and will not be set aside unless a preponderance of the evidence clearly favors suppression. *Id.*; *State v. Prince*, 50,548 (La. App. 2 Cir. 4/13/16), 195 So. 3d 6. The appellate court must look at the totality of the evidence presented at the hearing on the motion to suppress and may review the entire record, including testimony at trial. *State v. Bates*, 51,890 (La. App. 2 Cir. 2/28/18), 246 So. 3d 672; *State v. Howard*, 49,965 (La. App. 2 Cir. 6/24/15), 169 So. 3d 777, *aff'd*, 15-1404 (La. 5/3/17), 226 So. 3d 419.

The state troopers investigating this accident, namely Troopers Cobb, Meek, and Sharma, testified that they believed a warrant was not necessary under Louisiana's implied consent law in motor vehicle accidents where a

25

fatality occurs. The *Birchfield* decision, on which the defendant relies, was decided five months after the fatal accident in this case occurred.[5] At the time of this accident, pursuant to the implied consent law, licensed Louisiana motorists were deemed to have consented to blood alcohol, drug screening tests, and blood draws under certain conditions such as an arrest for intoxication or a fatal motor vehicle accident. A warrant for a police search is not necessary when consent is obtained, whether express or implied. Accordingly, the state troopers were not required to secure a warrant to draw blood from Miller, who was operating a motor vehicle involved in a collision in which a fatality resulted. For this reason, the state contends that the state troopers reasonably relied on the law that authorized the warrantless blood draw from Miller. We agree.

In *Davis v. United States*, 564 U.S. 229, 131 S. Ct. 2419, 180 L. Ed. 2d 285 (2011), the court held that "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." This good-faith exception also extends to statutes. In *Illinois v. Krull*, 480 U.S. 340, 107 S. Ct. 1160, 94 L. Ed. 2d 364 (1987), the court extended the good-faith exception to searches conducted in reasonable reliance on subsequently invalidated statutes. *Id.*, at 349-350, 107 S. Ct. 1160.

The good-faith exception to the exclusionary rule and reasonable reliance on the implied consent statute by police officers was applied by this court in granting the state's writ application in *State v. Knaebel*, 51,580 (La.

---

[5] *Birchfield* held that North Dakota's implied consent statute was unconstitutional where the defendant was arrested for driving while intoxicated, and he was informed that his refusal to submit to a blood draw test after an arrest for intoxication could result in criminal sanctions under the implied consent statute.

App. 2 Cir. 4/20/17) (unpub.), *writ denied* 2017-0829 (La. 9/29/17), 227 So. 3d 282.  The trial court had granted the defendant's motion to suppress based on the holding in *Birchfield, supra.*  We granted relief, holding:

> [W]e find that although the decision in *Birchfield* is retroactively applicable to the facts of this case, the officer conducting the blood test acted in objectively reasonable reliance on the implied consent statute.  As such, the good faith exception to the exclusionary rule applies and suppression of the results of the blood test is not warranted.  *Illinois v. Krull, supra.*

After review, we conclude that the state troopers who investigated this case acted in objectively reasonable reliance on the implied consent statute.  For this reason, the good-faith exception to the exclusionary rule applies and suppression of the blood test results is not warranted.

Even without applying the good-faith exception in this case, we further conclude that the warrantless blood draw from Miller was not an unreasonable search that violated the Fourth Amendment.

For the reasons that follow, we also hold that the exigent circumstances and other pressing needs arising from the fatal collision would cause unnecessary delay and require police to cause a blood test to be administered without a warrant under *Mitchell v. Wisconsin*, 139 S. Ct. 2525, __ U.S. __, 204 L. Ed. 2d 1040 (2019).

The accident occurred at about 6:46 a.m.  When EMS arrived, Miller lay moaning and gurgling on the floorboard in his truck.  The EMS team was attempting to extricate him from the jammed doors when the first officers (sheriff's deputies) arrived on the scene.  Once they removed the unconscious Miller from his truck, they prepared him for an emergency airlift to University Health in Shreveport, while the two deputies were preparing a landing zone for the helicopter and rerouting traffic with a

27

roadblock. State troopers began to arrive from 7:28 to 7:48 a.m., one just minutes before the unconscious Miller was airlifted to Shreveport. Hospital records show that Miller arrived unconscious or in a coma. He was on breathing support and had to be intubated with a ventilator as they prepared him for surgery. The blood test was requested and performed at 9:04 a.m., only minutes before surgery. When Trooper Cobb arrived at the hospital after leaving the accident scene to interview Miller, he was told Miller was in surgery. When he returned later, Miller was still under sedation and could not be interviewed.

In *Mitchell v. Wisconsin*, *supra,* the court held that (1) the exigent-circumstances exception to the Fourth Amendment's warrant requirement almost always permits a blood test without a warrant *where the driver suspected of drunk driving is unconscious and therefore cannot be given a breath test;* (2) the State of Wisconsin (which relied solely on its implied consent statute to obtain the blood test without a warrant) did not waive the argument that exigent circumstances almost always permitted a warrantless blood test on an unconscious drunk-driving suspect;[6] and, (3) the decreased time required to obtain a search warrant did not preclude warrantless blood draws from unconscious drunk-driving suspects. The *Mitchell* court specifically considered the recent holdings in *Birchfield*, *supra*, and *McNeely*, *supra*, essentially reviving the well-known exigent-circumstances exception of *Schmerber v. California*, 384 U.S. 757, 86 S. Ct. 1826, 16 L. Ed. 2d 908 (1966). *Schmerber* held that the evanescent nature of blood

---

[6] Wisconsin never argued exigent circumstances at the trial level, the appellate level, the state supreme court level, and at the U.S. Supreme Court level even though the facts of the case supported it. Nevertheless, the court ruled that it was not waived.

alcohol and the time delays in obtaining a warrant along with other pressing needs in the midst of an accident investigation created exigent circumstances for police such that obtaining blood tests without a warrant is not an unreasonable search under the Fourth Amendment.

In this case, several factors heightened the exigency for police to obtain a blood test without going through the process of obtaining a warrant. Miller was unconscious and could not perform a breath test or speak to police so that they could assess his condition; the accident occurred in a rural part of the parish at 6:46 a.m. shortly before a shift change, both of which must have contributed to the 45-to-60 minute delay before troopers arrived at the site. As soon as deputies and troopers arrived, they had to secure the accident site, and Miller was unconscious and critically injured. He was airlifted to Shreveport. Meanwhile, troopers quickly learned from witnesses that Miller crossed the yellow line into oncoming traffic and caused the collision that killed Mr. Mancil. They also learned that Miller had been driving in the wrong lane of the highway earlier that morning, which would alert someone that he was likely driving while intoxicated or impaired in some way. Miller's unconscious condition and serious injuries deprived police of an opportunity to administer a breath test or conduct any other tests that would raise the suspicion that he was intoxicated. However, because there was a fatality, they were confident that they would be able to promptly obtain a blood test by virtue of the implied consent law as soon as Miller arrived at the hospital for medical treatment.

The ER resident physician's medical report showed that Miller was treated at 8:47 a.m. The report says that Joseph Wade Miller, age 29 male,

29

was involved in a MVC. He was reportedly 'GSC 3'[7] (in a deep coma) on arrival to the hospital and intubation was attempted three times. The EMS unit had placed an LMA prior to arrival.[8] The report indicated that Miller was sedated and on a ventilator.

Troopers Sharma and Meeks were dispatched to the hospital for a blood draw pursuant to Louisiana's implied consent law in cases of accidents that result in a fatality or serious injury. The blood draw occurred at 9:04 a.m. Miller went into surgery shortly thereafter.

Both Sharma and Cobb testified that they ordered the blood draw under the authority of the informed consent statute, La. R.S. 32:681.

The *Mitchell* court noted that the exigency is even more acute in unconscious driver cases involved in a crash. The accident can give officers a slew of urgent tasks beyond that of securing medical care. They may have to deal with fatalities, preserve evidence at the scene, block and redirect traffic, all of which will put off applying for a warrant. The testimony of officers tasked in this case bears out the *Mitchell* court's concerns in this case.

We therefore conclude that the search or blood draw by law enforcement in this case without a warrant was reasonable and did not constitute an unreasonable search under the Fourth Amendment.

The second part of Miller's first assignment of error alleges that LSP failed to comply with all the mandates of Louisiana's implied consent

---

[7] Glasgow Coma Scale. The GCS measures three different components: eye opening (E), verbal responses (V), and motor responses (M). The summation of the individual score (i.e., E + V + M) classifies the person into mild (score = 13–15), moderate (score = 9–12), severe (score = 3–8), and vegetative state (score <3).

[8] A laryngeal mask airway (LMA) — also known as laryngeal mask — is a medical device that keeps a patient's airway open during anesthesia or unconsciousness.

statute. He maintains that LSP failed to comply with the requirements for postaccident drug testing involving fatalities and pretesting procedures. In order for the state to avail itself of the implied consent law, he maintains that the state bears the burden of showing that it has complied with all the mandated statutory provisions, including promulgated procedures. *State v. Tanner*, 457 So. 2d 1172 (La. 1984).

Miller argues that La. R.S. 32:681(B) mandates that "the law enforcement agency by which such officer is employed shall designate in writing under what conditions the tests shall be administered." He contends that Trooper Sharma could have used the "Department of Public Safety and Corrections Notice to Withdraw Blood for Chemical Test for Intoxication" (Ex. 1-Motion to Suppress) (hereinafter "DPS Blood Test Form") that was available to him, which provided a "check-box" listing conditions under which the test could be administered, one of which must be present. Although all the remainder of the form is completed, including the "Voluntary Submission to Chemical Test" separate section at the bottom of the page, Trooper Sharma failed to check off any one or more of the "check-box" conditions listed. Miller argues that the lack of documentation not only violates the statute but also its underlying purpose, which is to create a contemporaneous written record of everything that was observed and done so that the memory of details would not be lost to time. Additionally, Miller argues that LSP failed to comply with La. R.S. 32:681(D), which specifically implicates the provisions applicable to the pretesting procedures found in La. R.S. 32:661(C).

Miller argues that LSP failed to read aloud the standardized forms approved by the Department of Public Safety and Corrections ("DPSC")

31

before drawing his blood.  He claims that Trooper Cobb backdated forms certifying that he actually read the forms to Miller, creating a misconception that Cobb timely complied with the notice requirement of La. R.S. 32:661(C).  Miller further argues that this misconception also undermines the purpose of the forms, which is to document an officer's compliance with the procedural requirements of Louisiana's implied consent law.

After review of the relevant statutes and exhibits, we conclude that Miller's assertions and concerns do not invalidate the blood draw in this case.  Louisiana has two implied consent provisions regarding intoxication and drug abuse impairment while operating a motor vehicle: Part XIV "TESTS FOR SUSPECTED DRUNKEN DRIVERS" and Part XVI, a single statute that concerns "POST-ACCIDENT DRUG TESTING."  There are some relevant distinctions between the two implied consent provisions.  The implied consent provision of Part XIV, La. R.S. 32:661(A), concerns chemical testing of operators of motor vehicles who have been arrested for an offense while driving and believed to be under the influence of alcoholic beverages or a CDS.  In other words, the person must be under arrest for committing a driving offense and also suspected of being intoxicated or under the influence of a CDS, or under arrest for simply driving while intoxicated or impaired by a CDS.

By contrast, Part XVI, the implied consent provision for postaccident drug testing, La. R.S. 32:681(A), does not require that the driver be under arrest, or that an officer have probable cause or reasonable suspicion that the motor vehicle operator is intoxicated or under the influence of a CDS.  Consent to a blood, urine or other chemical test is deemed to be voluntary if

32

two circumstances are present: (1) the driver was involved in a collision, crash, or other casualty (2) which resulted in a fatality.

Two provisions in R.S. 32:681 are the source of Miller's argument. Subsection (B) requires that the law enforcement officer who orders the blood test on a person must have reasonable grounds to believe that person was the operator of the vehicle when the collision, crash, or casualty which caused the fatality occurred. The last sentence of the subsection reads:

> The law enforcement agency by which such officer is employed shall designate in writing under what conditions the tests shall be administered.

Subsection (D) of R.S. 32:681 states that chemical tests of a person's blood or urine or other bodily substance for the presence of an abused substance or CDS or other impairing substance "shall be administered in the same manner and subject to the provisions of Part XIV of this Chapter."

Miller argues that Trooper Sharma disregarded this statutory mandate. Specifically, he contends that Sharma was required to check off one of the three boxes on the DPS Blood Test Form, particularly the box that states the person named to be tested is "dead, unconscious, or otherwise" incapable of refusing due to a condition.

Based on our reading, the plain meaning of this provision is that the agency that employs the enforcement officer requesting the blood draw, e.g. the DPSC or the LSP, must have a written policy designating the conditions under which the chemical tests are administered. We do not read this provision to require a written provision or "check-box" on the upper half of the DPS Blood Test Form. In any case, the form has a special section called "Voluntary Submission to the Chemical Test," which was filled in by the

33

state troopers, and where it calls for Miller's signature, they wrote in "unable."

Although neither Nurse Mullins nor Trooper Sharma could remember if Miller was unconscious at the time his blood was drawn, the overwhelming evidence is that at the very least, he was semiconscious under heavy sedation on a ventilator. Miller was unconscious when he was placed in the helicopter. The ER report listed his condition as GCS-3, in a coma or unconscious. The treating physician noted that Miller had to be sedated and intubated.

The state explains that the DPS Blood Draw form consists of two components. The top half of the form concerns chemical testing for people under arrest pursuant to R.S. 32:661(A)(2), whereas the bottom part of the form concerns chemical tests for R.S. 32:681. Simply reading this section confirms the state's position. The "Voluntary Submission to the Chemical Test" section clearly states that a blood test is being administered due to Miller's involvement in a traffic fatality. Thus, LSP complied with the requirements of R.S. 32:681(B).

Miller further contends that the state did not comply with R.S. 32:681(D), which requires that the postaccident drug tests be administered in the same manner and subject to the provisions of Part XIV, which governs tests for drunken drivers. This provision can be read narrowly or broadly, either concerning only the requirement that the tests be performed by a physician, physician assistant, R.N. etc., allowing the person to get his own test and other things under R.S. 32:662, or more broadly to include all provisions of the drunken drivers testing procedures. Miller insists that the state troopers in this case, pursuant to subsection C(1) of R.S. 32:661, should

34

have read to Miller his *Miranda* rights, that his driving privileges can be suspended for refusing to take the test, that he could lose his driving privileges if he submits to the test and it shows the presence of any CDS, the name of all law enforcement officers involved in the stop, and, request the person to sign the form, or if he is unwilling or unable, the arresting officer must certify that he has read to the arrested person the above, and that he is unable to sign.

This provision of the statute plainly applies to persons who are under arrest for suspected intoxication or other driving offense committed while intoxicated. Miller was not under arrest. No state troopers were present at the accident scene or at the hospital when Miller was there to assess if he had been drinking or was under the influence of a CDS. Most importantly, however, reading subsection C(1) to Miller while he lay unconscious or under semiconscious sedation, seriously injured and preparing for surgery, would be a vain and useless exercise. *State v. Caccioppo*, 10-385 (La. App. 5 Cir. 2/15/11), 61 So. 3d 61.

Finally, the trial transcript shows that much ado was made over backdated forms by Trooper Cobb. This matter arose largely because the fatality occurred on February 9, 2016, but the blood tests results and arrest did not occur until May. According to testimony at the hearing on the motion to suppress, the computer automatically populated much of the information, including signature dates. Most, if not all, of the problems seem to have occurred on the arrestee forms, among them a *Miranda* rights form says that Miller was read his *Miranda* rights on the date of the accident, February 9, 2016, whereas in actuality he was not read his *Miranda* rights until he was arrested on May 26, 2016.

35

All of these backdating matters were clarified by testimony at the motion to suppress, and we do not find that they render the blood tests inadmissible at trial.

This assignment is without merit.

## ERROR PATENT

Our review of the record discloses that the trial court improperly restricted the first five years of the defendant's sentence be served without the benefit of probation, parole, or suspension of sentence after adjudicating him a second-felony offender. Additionally, the trial court failed to sentence defendant to a court-approved substance abuse program.

La. R.S. 14:32.1(B) provides, in relevant part, that the penalty for conviction of vehicular homicide is a fine of not less than $2,000, nor more than $15,000, and imprisonment, with or without hard labor, for not less than five years, but not more than 30 years, and at least five years of the sentence of imprisonment shall be imposed without benefit of probation, parole, or suspension of sentence. The trial court is also required to order the defendant to participate in a court-approved substance abuse program.

At the time of this offense, La. R.S. 15:529.1(A)(1) provided that if the second felony was such that upon a first conviction the offender would be punishable by imprisonment for any term less than his natural life, then the sentence to imprisonment would be for a determinate term not less than one-half the longest term and not more than twice the longest term prescribed for a first conviction.[9]

---

[9] R.S. 15:529.1 (A) was amended in 2017 to set the mandatory minimum for a second felony offense at one-third the longest term for the underlying offense. The change, which was effective November 1, 2017, was expressly made prospective only, and thus does not apply to this case. 2017 La. Acts Nos. 257, 258.

La. R.S. 15:529.1(G) requires that any sentence imposed under the provisions of this section shall be at hard labor without benefit of probation or suspension of sentence.

The penalty range for vehicular homicide, after applying the habitual offender statute, would be imprisonment for not less than 15 years and not more than 60 years. Under La. R.S. 15:529.1(G), the entire sentence must be imposed without benefit of probation or suspension of sentence. Additionally, the court failed to sentence Miller to a court-approved substance abuse program. This court is authorized to correct an illegal sentence pursuant to La C. Cr. P. art. 882, when the sentence does not involve the exercise of sentencing discretion by the trial court. See also, La. R.S. 15:301.1.

Therefore, we amend Miller's sentence to reflect 20 years at hard labor, without benefit of probation or suspension of sentence, along with a fine of $2,000, plus court costs, and enrollment in a court-approved substance abuse program.

## CONCLUSION

For the foregoing reasons, the defendant's conviction is affirmed. We amend Miller's sentence to be served as 20 years at hard labor without benefit of probation or suspension of sentence. Miller is ordered to enroll into an approved substance abuse program and pay a fine of $2,000 plus court costs.

**CONVICTION AFFIRMED; SENTENCE AMENDED.**